# DONNELLY *v.* UNITED STATES.[1]

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 97.   Argued December 18, 1912.—Decided April 7, 1913.

From an early period Congress has accorded to the Executive a large discretion about setting apart and reserving portions of the public domain in aid of particular public purposes.

Section 2 of the act of April 8, 1864, conferring power on the Executive to set apart reservations for Indians, was a continuing power and was not exhausted by the first order establishing reservations thereunder.

The extension of the Hoopa Valley Reservation made by Executive Order of October 16, 1891, including a tract of country in California one mile in width on each side of the Klamath River, was lawfully established pursuant to the act of 1864.

In view of the history of the case, the custom of the Klamath Indians for whose benefit the Hoopa Valley Reservation was established, the Government ownership of the territory and its acquisition from Mexico under the Treaty of Guadalupe Hidalgo, as well as the statutes, and decisions of the courts, of California to the effect that the Klamath River is a non-navigable stream, *held* that such reservation included the bed of the Klamath River.

What are navigable streams within the meaning of the local rules of

---

[1] See also p. 708, *post.*

property is for the determination of the States; and where a State by statute enumerates the navigable streams within its borders those not enumerated are non-navigable in law.

The prime requisites for the validity of a mining claim are discovery of a valuable mineral deposit, an actual taking possession thereof, and the performance of the requisite amount of development work; where the record does not disclose facts showing the existence of these elements a finding cannot be supported that valid rights against the Government existed.

The creation and maintenance of a school district by the State of California within the public domain and not in section 16 or 36 could not impair the right of the Federal Government to dispose of that domain.

The words "sole and exclusive jurisdiction" as used in § 2145, Rev. Stat., do not mean that the United States must have sole and exclusive jurisdiction over the Indian country in order that such section may apply to it; those words are used in order to describe the laws of the United States which by that section are extended to the Indian country. *In re Wilson*, 140 U. S. 575.

The term "Indian country" as used in §§ 2145, 2146, Rev. Stat., is not confined to lands to which the Indians retain their original right of possession, but includes those set apart out of the public domain as reservations for, and not previously occupied by, the Indians.

The killing of an Indian by one not of Indian blood, when committed upon an Indian reservation within the State of California, is punishable, under §§ 2145 and 5339, Rev. Stat., in the Federal courts.

Hearsay evidence with a few well-recognized exceptions, is excluded by courts that adhere to the principles of the common law.

After reviewing numerous authorities, *held* that, in this case, the court properly excluded hearsay evidence relating to the confession of a third party, then deceased, of guilt of the crime with which defendant was charged.

In this country there is a great and practically unanimous weight of authority in the state courts against admitting evidence of confessions of third parties made out of court and tending to exonerate the accused.

THE facts, which involve the validity of a conviction and sentence of a white man for murder of an Indian on the Klamath River within the Hoopa Valley Reservation, are stated in the opinion.

*Mr. John F. Quinn,* with whom *Mr. W. F. Clyborne* was on the brief, for plaintiff in error:

To give the United States court jurisdiction the indictment must allege that plaintiff in error was an Indian. *Draper* v. *United States,* 164 U. S. 241.

Federal courts have jurisdiction of offenses committed within the limits of the Hoopa Valley Indian Reservation only under § 9 of the act of 1885, which act distinctly provides that Indians shall be amenable to the courts of the United States for the commission of the crime of murder against the person of an Indian or other person. But only Indians can be proceeded against under this act. See § 5339, Rev. Stat.

The crime charged was not committed within the limits of any of the places enumerated in that section and consequently the United States courts would not have jurisdiction as the Hoopa Valley Reservation is not a place under the exclusive jurisdiction of the United States.

The State, not the United States, has jurisdiction of the crime of murder committed within the limits of an Indian reservation within the boundaries of a State by a white person against a white person. *United States* v. *McBratney,* 104 U. S. 621; *United States* v. *Draper,* 164 U. S. 240; *United States* v. *Kagama,* 118 U. S. 385.

It is not charged in the indictment that the reservation or the place of the alleged crime is Indian country. This reservation is not and never has been Indian country since California became part of the United States.

In order to be Indian country the Indians must retain their original title to the soil, and this extension does not include any land to which the original Indian title has never been extinguished. *Bates* v. *Clark,* 95 U. S. 204, 209; *United States* v. *Celestine,* 215 U. S. 285.

There is no treaty with any tribe of Indians as to the jurisdiction over the land involved in this case. Neither is there any treaty or act of Congress defining it to be

or giving it the character of Indian country.   Under the act of 1864 and the executive orders the United States simply set apart for the purposes of an Indian reservation land to which it already had title.   If an Indian reservation within a State is Indian country, the Federal courts would have had jurisdiction in the *Draper* and *McBratney Cases*, under the act of June 30, 1834, and as amended in 1864 (§ 2145, Rev. Stat.), and under *Westmoreland* v. *United States*, 155 U. S. 547, which held that the court had jurisdiction of a white person.   The only way in which the *Draper* and *McBratney Cases* can be reconciled with the *Westmoreland Case* is that an Indian reservation within the boundaries of a State is not Indian country.

It is essential to allege in the indictment and prove on the trial that the accused is an Indian.   *United States* v. *Hadley*, 99 Fed. Rep. 437; *United States* v. *Logan*, 105 Fed. Rep. 240; *State* v. *Campbell*, 53 Minnesota, 354.

The United States never reserved any jurisdiction over the land included within the Hoopa Reservation either in the act admitting California into the Union or in any other act.   Neither did the State of California at any time cede to the United States any jurisdiction over such land or disclaim in any manner jurisdiction over the same.

No treaty or other compact was ever entered into between the United States or any band or tribe of Indians in reference to such land.   The State of California had absolute criminal jurisdiction over this land for 41 years, and even if an Indian had killed another Indian on the land mentioned in the indictment on October 15, 1891, or any time prior thereto, the state and not the Federal courts would have had jurisdiction.

The executive order of President Harrison issued October 16, 1891, creating the extension to the Hoopa Valley Reservation, is absolutely void, not being authorized by any act of Congress.   There is now no legal extension to the Hoopa Valley Reservation and there

can be none until there is an act of Congress authorizing it.

But even if the extension of the reservation was lawfully created, the alleged crime was committed on the Klamath River which is outside the limits of the extension. The description excludes the river, and even if the order had attempted to include it, it would have been void to that extent, as California was admitted into the Union upon the condition that the navigable rivers should be public highways as to the citizens of all States. 9 Stat. 453; *Lux* v. *Haggin,* 69 California, 335.

The Klamath River is a navigable stream and the alleged crime occurred at a point on the river where it was actually used for the purposes of commerce.

The court will take judicial notice that the tide ebbs and flows on the Klamath near its mouth. See *United States* v. *La Vengeance,* 3 Dall. 297; *The Apollon,* 9 Wheat. 374; *Peyroux* v. *Howard,* 7 Pet. 341; 1 Greene Ev., § 6.

As the Klamath River flows into the Pacific Ocean, the court will take judicial notice that it is a tidal river at least near its mouth.

President Harrison recognizing then the sovereignty of the States over navigable waters purposely excluded the Klamath River from the limits of the reservation he attempted to create by his executive order of October 16, 1891.

The alleged crime was committed on the Klamath River. The Government's testimony proves this.

It was the theory of the Government at the trial as before stated that Chickasaw was shot while in bathing and that his slayer occupied the clump of willows on the sand or gravel bar when he fired the fatal shot.

The alleged crime took place below ordinary high water. A river is composed of its banks, bed, and water. It requires bed, shores, and banks, as well as water, to con-

stitute a river. *Ravenwood* v. *Fleming*, 22 W. Va. 52; *Ellis* v. *Gerbing*, 22 L. R. A. (N. S.) 337.

Prior to the attempted establishment of the reservation a mining claim had been located and a school district established at the place where the crime was alleged to have been committed, so that, under the executive order, that particular place was excepted from the reservation.

There was error in excluding evidence as to the confession of Joe Dick. See where Wigmore on Evidence in §§ 1476 *et seq.* attacks the principle that would accept declarations against a pecuniary or a proprietary interest, but not a penal interest and shows the injustice of prohibiting the confession of a person, deceased or otherwise, unavailable as witness, of a crime for which another person is being tried.

There was error in denying motion for a new trial and in arrest of judgment.

*Mr. Assistant Attorney General Denison* for the United States:

Crimes by whites against Indians within Indian country are crimes against the United States subject to the jurisdiction of its courts. *United States* v. *Bridleman*, 7 Fed. Rep. 898; *United States* v. *Barnhart*, 22 Fed. Rep. 285; *United States* v. *Ewing*, 47 Fed. Rep. 809; *United States* v. *Hunter*, 21 Fed. Rep. 615; *United States* v. *Loving*, 34 Fed. Rep. 715; *United States* v. *Mullin*, 71 Fed. Rep. 682; *United States* v. *Crook*, 179 Fed. Rep. 391; *United States* v. *Payne*, 22 Fed. Rep. 426; *McKnight* v. *United States*, 130 Fed. Rep. 659; *United States* v. *Sutton*, 215 U. S. 291; *Hallowell* v. *United States*, 221 U. S. 317; *United States* v. *Howard*, 17 Fed. Rep. 638; *United States* v. *Stocking*, 87 Fed. Rep. 857.

See *contra*, *United States* v. *Logan*, 105 Fed. Rep. 240, and *semble*, *United States* v. *Hadley*, 99 Fed. Rep. 437; *United States* v. *Ward*, 42 Fed. Rep. 320.

Revised Statutes, § 2145, applies to crimes either by or against Indians within the Indian country. *United States* v. *McBratney,* 104 U. S. 621 and *Draper* v. *United States,* 164 U. S. 240, decided merely that crimes by whites against whites were subjects of state jurisdiction, but left open the question here involved as to crimes by or against Indians.

These latter crimes, being a part of the intercourse between the two races, are fundamentally within the scope of regulation by Congress rather than by the States. *Worcester* v. *Georgia,* 6 Pet. 515, 557, and see act of July 22, 1790, c. 33; 1 Stat. 137; of March 1, 1793, 1 Stat. 329; of May 19, 1796, 1 Stat. 469; of March 3, 1799, 1 Stat. 743; of March 30, 1802, 2 Stat. 139; of March 3, 1817, 3 Stat. 383; of June 30, 1834, 4 Stat. 729; of March 27, 1854, 10 Stat. 269, 270; §§ 2145, 2146, Rev. Stat.

The protection of the Indians from crimes by whites intruding on their reservations is a part of the Federal function founded both on the prevention of Indian outbreaks, *Worcester* v. *Georgia,* 6 Pet. p. 552, and the duty of the United States to protect the Indians as its wards. See *Kagama* v. *United States,* 118 U. S. 375; *United States* v. *Rickert,* 188 U. S. 432, 437; *Jones* v. *Meehan,* 175 U. S. 10; *Matter of Heff,* 197 U. S. 488, 498; *Rainbow* v. *Young,* 161 Fed. Rep. 835; *Heckman* v. *United States,* 224 U. S. 413; *United States* v. *Sutton, supra.* This is implied in the very fact of the creation of the reservation for the exclusive and undisturbed use of the Indians. *Worcester* v. *Georgia, supra; Rainbow* v. *Young,* 161 Fed. Rep. 835. See also Rev. Stat., § 2114, and the other sections under the titles "Government and protection of Indians," and "Government of Indian country."

The act of March 3, 1885, does not repeal Rev. Stat., § 4215; *Re Wilson,* 140 U. S. 575, but merely repeals *pro. tanto,* § 2146, by which theretofore all crimes by Indians against Indians had been left to the exclusive con-

trol of the Indian tribes themselves. *Worcester* v. *Georgia*, *supra*, and statutes, *supra;* see *Kagama* v. *United States*, 118 U. S. 375, explaining the effect of *Crow Dog*, 109 U. S. 556. See also *Gon-shay-ee, Petitioner*, 130 U. S. 343; *In re Wilson*, 140 U. S. 575, p. 578; *United States* v. *Whaley*, 37 Fed. Rep. 145; *United States* v. *Ewing*, 47 Fed. Rep. 809; *Ex parte Hunt*, 157 Fed. Rep. 130; *Re Blackbird*, 109 Fed. Rep. 139; *Goodson* v. *United States*, 7 Oklahoma, 117; *Ex parte Hart*, 157 Fed. Rep. 130; *United States* v. *King*, 81 Fed. Rep. 625; *United States* v. *Cardish*, 145 Fed. Rep. 242.

An "Indian Reservation" is "Indian Country," even though the reservation has been carved out of the public domain. *In re Wilson*, 140 U. S. 575; *United States* v. *Thomas*, 151 U. S. 577; *United States* v. *Leathers*, 6 Sawyer, 17; *United States* v. *Martin*, 14 Fed. Rep. 821; *United States* v. *Bridleman*, *supra*.

The extension of the Hoopa Valley Reservation was lawful. It was an extension, not only of the Hoopa Valley Reservation, but of the Klamath River Reservation, and so came within the express language of the act of April 8, 1864. See 33 L. D., p. 205.

In any event, the executive had the power to set apart the reservation. *In re Wilson*, 140 U. S. 575; *Spalding* v. *Chandler*, 160 U. S. 394, 403; *United States* v. *Leathers*, 6 Sawyer, 17; *United States* v. *Grand Rapids R. Co.*, 154 Fed. Rep. 131; *Gibson* v. *Anderson*, 131 Fed. Rep. 39, 41; *United States* v. *Martin*, 14 Fed. Rep. 817, 821; *United States* v. *Payne*, 8 Fed. Rep. 883, 887; 14 Ops. Atty. Gen. 181; 17 Ops. Atty. Gen. 258; 26 Ops. Atty. Gen. 92; 28 Ops. Atty. Gen. 143.

The reservation was at least *de facto*, and therefore Indian country. *Worcester* v. *Georgia*, 6 Pet. 515; *Fellows* v. *Blacksmith*, 19 How. 366; *Kagama* v. *United States*, 118 U. S. 375, 384; *Spalding* v. *Chandler*, 160 U. S. 394, 403, 404.

Congress was advised of its creation and has continued its appropriation undisturbed.

The point that the place of the crime was covered by a valid mining claim, and was, therefore, not within the reservation, is not properly raised by the bill of exceptions. *Allis* v. *United States*, 155 U. S. 117; *Thiede* v. *Utah*, 159 U. S. 71; *United States* v. *Hough*, 103 U. S. 71; *Union Ins. Co.* v. *Smith*, 124 U. S. 405; *Shelp* v. *United States*, 81 Fed. Rep. 694; *Richardson* v. *United States*, 181 Fed. Rep. 1.

The fact that there is nothing in the record to show otherwise does not prove the mining claim had been made good or "was valid." *Black* v. *Elkhorn Mining Co.*, 163 U. S. 445, p. 450; *Belk* v. *Meagher*, 104 U. S. 279, p. 282; *Spalding* v. *Chandler*, 160 U. S. 394, at 404–405; *M., K. & T. Ry.* v. *Roberts*, 152 U. S. 114, 116, 118; *Gillis* v. *Downey* (C. C. A., 8th Cir.), 85 Fed. Rep. 483, 489.

The place of the crime was not excluded from the extension because of the existence of a state school district; that point is not sound on the merits, nor was it properly raised. *United States* v. *Thomas*, 151 U. S. 577, p. 583, and cases there cited. *Beecher* v. *Weatherby*, 95 U. S. 517, 525.

The point that the river bed was not within the reservation is not properly raised in the record. *Columbia R. R. Co.* v. *Hawthorne*, 144 U. S. 202; *Bogk* v. *Gassert*, 149 U. S. 17; *Union Pacific Ry. Co.* v. *Daniels*, 152 U. S. 684; *Perovich* v. *United States*, 205 U. S. 86, 91.

Nor is it sound on the merits. California acts of February 24, 1891, c. 14, and March 11, 1891, c. 92; *Caldwell* v. *County of Sacramento*, 79 California, 347, 349; *Leovy* v. *United States*, 177 U. S. 621, pp. 634–635, *semble*.

The exclusion of the testimony of William Norris to the effect that one Joe Dick, since deceased, had confessed his own guilt of the murder, may present a grave and doubtful question, see Wigmore on Evidence, §§ 1476 and 1477; *United States* v. *Mulholland*, 50 Fed. Rep. 413,

collecting the authorities, but the evidence was properly excluded.

MR. JUSTICE PITNEY delivered the opinion of the court.

Plaintiff in error was convicted in the Circuit Court of the United States for the Northern District of California, upon an indictment for murder, and, having been sentenced to life imprisonment, sues out this writ of error. The indictment charged him with the murder of one Chickasaw, an Indian, within the limits of an Indian reservation known as the Extension of the Hoopa Valley Reservation, in the County of Humboldt, in the State and Northern District of California. The evidence tended to show that Chickasaw, who was an Indian and a member of the Klamath Tribe, was shot through the body and mortally wounded while he was in or near the edge of the water of the Klamath River, at a place within the exterior limits of the Extension.

The trial proceeded upon the theory that the crime was committed within the river bed and below ordinary high-water mark—a theory favorable to the plaintiff in error, in that it furnishes the basis for one of the principal contentions made in his behalf. The indictment does not allege, nor did the Government undertake to prove, that plaintiff in error was of Indian blood; there was evidence tending to show that he was a white man; and the trial judge instructed the jury in effect that this question was immaterial. It was contended that the Circuit Court was without jurisdiction, first, because the place of the commission of the alleged offense was not within the limits of the Extension of the Hoopa Valley Reservation, but was upon the Klamath River, and therefore outside of those limits; and, secondly, because it did not appear that the defendant was an Indian. These contentions, having been overruled below, are renewed here, and some other

jurisdictional questions are raised. In addition, it is contended that the Circuit Court erred in refusing to permit the plaintiff in error to introduce evidence tending to show that one Joe Dick, a deceased Indian, had confessed just before his death that it was he who had shot and killed the Indian Chickasaw.

The bounds of the Hoopa Valley Reservation were first established by executive order of President Grant, dated June 23, 1876, made under authority of "An act to provide for the better organization of Indian affairs in California;" approved April 8, 1864; 13 Stat. 39, c. 48. The reservation, as thus delimited, comprised a tract of country in Humboldt County, about 89,000 acres in extent, lying on both sides of the Trinity River, above its junction with the Klamath. Exec. Ord. Ind. Reserv. (ed. 1912), p. 38; 1 Kappler, 815.

What is known as the Extension of the Hoopa Valley Reservation was made by executive order of President' Harrison, dated October 16, 1891, and included "a tract of country one mile in width on each side of the Klamath River, and extending from the present limits of the said Hoopa Valley Reservation to the Pacific Ocean," with a proviso to be mentioned hereafter. Exec. Ord. Ind. Reserv. (ed. 1912), p. 39; 1 Kappler, 815. The extension as thus described took in the original Klamath River Reservation (established by President Pierce in 1855; Ex. Ord. Ind. Reserv. 1912, p. 41), that extended along the river for a distance of twenty miles from the ocean. This portion was, by act of June 17, 1892, 27 Stat. 52, c. 120, opened to settlement, entry and purchase. The *locus in quo* is not within the part thus opened, but is at a point higher up the river.

The indictment and conviction are based upon § 2145, Rev. Stat., providing that certain general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of

the United States, except the District of Columbia, "shall extend to the Indian country," and upon § 5339, Rev. Stat., which enacts that any person who commits murder in any place under the exclusive jurisdiction of the United States shall suffer death. These sections, together with § 2146, Rev. Stat., and § 9 of an act of March 3, 1885, 23 Stat. 362, 385, c. 341, being all pertinent to the discussion that follows, are set forth in the margin.[1]

---

[1] EXTRACTS FROM REVISED STATUTES.

SEC. 2145. Except as to crimes the punishment of which is expressly provided for in this Title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian Country.

SEC. 2146. The preceding section shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

SEC. 5339. Every person who commits murder . . . within any fort, arsenal, dock yard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States . . . shall suffer death.

ACT OF MARCH 3, 1885, SEC. 9.

That immediately upon and after the date of the passage of this act all Indians, committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny, within any Territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such Territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases; and all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any State of the United States, and within the limits of any Indian reservation, shall be subject to the

The record presents the following questions, and it will be assumed that, in view of the course taken at the trial, they must all be answered favorably to the Government in order that the conviction may be sustained.

(1) Was the Extension of the Hoopa Valley Reservation lawfully established?

(2) Does it include the bed of the Klamath River?

(3) Is the place of the homicide, for particular reasons to be mentioned, not a part of the reservation?

(4) Is the Extension (if lawfully established) "Indian country" within the meaning of § 2145, Rev. Stat.?

(5) Is the killing of an Indian by one who is not of Indian blood, when committed upon an Indian reservation within the State of California, punishable in the Federal courts?

(6) Was the evidence offered to show an alleged confession by Joe Dick properly excluded?

1. It is contended in behalf of the plaintiff in error that the authority conferred upon the Executive by Congress in the act of April 8, 1864 (13 Stat. 39, c. 48), was exhausted in the creation by President Grant of the Hoopa Valley Reservation in 1876. Section 2 of that act provides as follows: "Sec. 2. *And be it further enacted,* That there shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said State, to be retained by the United States for the purposes of Indian Reservations, which shall be of suitable extent for the accommodation of the Indians of said State, and shall be located as remote from white settlements as may be found practicable, having due regard to their adaptation to the purposes for which they are intended; *Provided,* That at least one of said tracts shall be located

same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States. 23 Stat. 362, 385, c. 341.

in what has heretofore been known as the northern district; . . . *and Provided, further,* That said tracts to be set apart as aforesaid may, or may not, as in the discretion of the President may be deemed for the best interests of the Indians to be provided for, include any of the Indian Reservations heretofore set apart in said state, and that in case any such reservation is so included, the same may be enlarged to such an extent as in the opinion of the President may be necessary, in order to its complete adaptation to the purposes for which it is intended."

The terms of this enactment show that Congress intended to confer a discretionary power, and from an early period Congress has customarily accorded to the Executive a large discretion about setting apart and reserving portions of the public domain in aid of particular public purposes. *Wolcott* v. *Des Moines Co.,* 5 Wall. 681, 688; *Grisar* v. *McDowell,* 6 Wall. 363, 381; *In re Wilson,* 140 U. S. 575, 577; *Spalding* v. *Chandler,* 160 U. S. 394, 404. See also *United States* v. *Leathers,* 6 Sawy. 17, 21; *United States* v. *Martin,* 14 Fed. Rep. 817, 821; *McFadden* v. *Mountain View Co.,* 97 Fed. Rep. 670, 673; *Gibson* v. *Anderson,* 131 Fed. Rep. 39, 41; *United States* v. *Grand Rapids &c. R. R. Co.,* 154 Fed. Rep. 131, 135; 17 Opinions Atty. Genl. 258; Act of February 8, 1887 (24 Stat. 388, c. 119), referred to in *In re Wilson,* 140 U. S. 575.

We have made a somewhat exhaustive examination of the history of the Indian reservations of California and what has been done by the executive and legislative departments of the Federal Government respecting them, and as a result we are convinced, first, that the situation of Indian affairs in that State in the year 1864 was such that Congress could not reasonably have supposed that the President would be able to accomplish the beneficent purposes of the enactment if he were obliged to act, once for all, with respect to the establishment of the several new reservations that were provided for, and were left

powerless to alter and enlarge the reservations from time to time in the light of experience. To mention but one obstacle that must have been within the contemplation of Congress: the Klamath and Hoopa-or Trinity Indians were at war with the forces of the United States at the time of the passage of the act of 1864, and had been so for some years. Indian Report, 1864, pp. 123, 127, 130, 133, 134–138. Secondly, beginning shortly after its passage, and continuing for a period of at least thirty years thereafter, Congress and the Executive practically construed the act of 1864 as conferring a continuing authority upon the latter, and a large discretion about exercising it.

Congress itself recognized the Hoopa Valley Reservation as lawfully existing, at least as early as July 27, 1868 (15 Stat. 198, 221, c. 248), when it appropriated money "to pay the settlers of Hoopa Valley for their personal property left upon the Hoopa Valley Reservation at the time the Government took possession;" and also "for removing the Indians from Smith's River Reservation to Hoopa Valley and Round Valley Reservations . . . and the Smith River Reservation is hereby discontinued;" and again, in the following year, (act of April 10, 1869, 16 Stat. 13, 37, c. 16), when it appropriated money for the pay of a miller upon the Hoopa Valley Reservation, and "to supply a deficiency for removing the Indians from Smith's River Reservation to Hoopa Valley and Round Valley Reservations." Yet no formal executive order had as yet been made setting aside the Hoopa Valley Reservation or fixing its bounds; and its status as a reservation rested upon a mere public notice given by the Superintendent of Indian Affairs for California, under date August 21, 1864, to the effect that under the act of April 8, 1864, and under instructions from the Interior Department, he had located a reservation in the Hoopa Valley, and that settlers should not make further improvements upon their

places (Rep. Ind'n Com'r, 1864, pp. 123, 138; Exec. Ord. Ind. Reserv.; 1912, p. 38; 1 Kappler, 815).

In the year following President Harrison's order the Extension was reported upon by the Indian agent to the Commissioner of Indian Affairs as being occupied by the Lower Klamath Tribe.   House Executive Documents, 2d Sess., 52d Cong., 1892–1893, Vol. 13 (Indian Report), p. 230.   And a similar report was made in the year 1894. House Executive Documents, 3d Sess., 53d Cong., 1894–1895, Vol. 15 (Indian Report), p. 117.   These reports were officially communicated by the Secretary of the Interior to Congress, and there is nothing to show any disapproval of the status of the Extension as an Indian reservation.

But, further, the Hoopa Valley Reservation was only one of four that were authorized by the act of 1864. Other reservations established thereunder were known as the Tule River, Round Valley, and Mission Reservations.   Upon the question of practical construction, the action taken by the Executive and by Congress respecting these is as significant as that taken with respect to the Hoopa Valley Reservation itself.   A sufficient summary of their history is given in *Crichton v. Shelton*, 33 L. D. 205, 209, 213.   The executive orders respecting them are to be found in Exec. Ord. Ind. Reserv. 1912, pp. 43, 55, 61, etc.   It will be seen that Presidents Grant, Hayes, Garfield, Arthur, Cleveland, and Harrison, successively, acted with respect to one or more of these reservations upon the theory that the act of 1864 conferred a continuing discretion upon the Executive; orders were made for altering and enlarging the bounds of the reservations, restoring portions of their territory to the public domain, and abolishing reservations once made and establishing others in their stead; and in numerous instances Congress in effect ratified such action.   In view of all this, we feel bound to hold that President Harrison's order of Octo-

ber 16, 1891, extending the Hoopa Valley Reservation, was within the authority of the act of 1864.

2. Does the reservation include the bed of the Klamath River? The descriptive words of the order are "a tract of country one mile in width on each side of the Klamath River and extending," etc. It seems to us clear that if the United States was the owner of the river bed, a reasonable construction of this language requires that the river be considered as included within the reservation. Indeed, in view of all the circumstances, it would be absurd to treat the order as intended to include the uplands to the width of one mile on each side of the river, and at the same time to exclude the river. As a matter of history it plainly appears that the Klamath Indians established themselves along the river in order to gain a subsistence by fishing. The reports of the local Indian agents and superintendents to the Commissioners of Indian Affairs abound in references to fishing as their principal subsistence, and the river is described as running in a narrow canyon through a broken country, the Indians as dwelling in small villages close to its banks. (Indian Reports, 1856, p. 238; 1857, p. 391; 1858, pp. 286–287; 1859, p. 437; 1861, p. 147; 1864, p. 122; 1866, p. 238; 1885, p. 264; 1888, p. 10; 1892, p. 230; 1894, p. 117; and see 33 L. D. 216.)

Upon the question of Government ownership, it is a matter of history that the entire territory in question was a part of the public domain that was transferred by Mexico to the United States in the year 1848 by the treaty of Guadalupe Hidalgo. February 2, 1848, 9 Stat. 922; *United States* v. *Kagama,* 118 U. S. 375, 381.

By act of September 9, 1850, 9 Stat. 452, c. 50, California was admitted into the Union "on an equal footing with the original States in all respects whatever." By § 3 of the same act it was provided: "That the said State of California is admitted into the Union upon the express

condition that the people of said State, through their legislature or otherwise, shall never interfere with the primary disposal of the public lands within its limits, and shall pass no law and do no act whereby the title of the United States to, and right to dispose of, the same shall be impaired or questioned; . ᾽. . and that all the navigable waters within the said State shall be common highways, and forever free, as well to the inhabitants of said State as to the citizens of the United States, without any tax, impost, or duty therefor."

It is insisted that the Klamath is a navigable river; and there is evidence in the record tending to show that the stream is navigable in fact, at certain seasons, from Requa (near its mouth) up to and above the *locus in quo.* But, in the view we take of the present case, the question of its navigability, in fact or in law, is immaterial except as it bears upon the title of the United States to the bed of the stream. The present question is whether that bed was a part of an Indian reservation, and that depends upon the question of ownership. The jurisdiction to punish the plaintiff in error for the murder of an Indian upon the reservation depends upon other considerations, as will appear hereafter.

In passing upon the effect of the act admitting Alabama into the Union, this court held, in *Pollard's Lessee* v. *Hagan,* 3 How. 212, that the State had the same rights, sovereignty, and jurisdiction over the navigable waters as the original States, and could exercise all the powers of government which belong to and may be exercised by them, excepting with respect to control over public lands owned by the United States; and that the title of the navigable waters, and the soil beneath them, was in the State and subject to its sovereignty and jurisdiction. In *Genesee Chief* v. *Fitzhugh,* 12 How. 443, it was settled that for purposes of admiralty jurisdiction the tidal test, prevailing in England for determining what is navigable

water, is not applicable to this country. In *Barney* v. *Keokuk*, 94 U. S. 324, 338, it was held that it is for the States to establish for themselves such rules of property as they may deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent thereto. The court, speaking through Mr. Justice Bradley, said (94 U. S. 338): "The confusion of navigable with tide water, found in the monuments of the common-law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British island and that of the American continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many States of doctrines with regard to the ownership of the soil in navigable waters above tide-water at variance with sound principles of public policy. *Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for the several States themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections.* In our view of the subject the correct principles were laid down in *Martin* v. *Waddell,* 16 Pet. 367; *Pollard's Lessee* v. *Hagan,* 3 How. 212; and *Goodtitle* v. *Kibbe,* 9 *Id.* 471. These cases related to tide-water, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of *The Genesee Chief,* 12 *Id.* 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. *It properly belongs*

*to the States by their inherent sovereignty,* and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the States in which the lands were situated."

The doctrine thus enunciated has since been adhered to. *Packer* v. *Bird,* 137 U. S. 661, 669; *Hardin* v. *Jordan,* 140 U. S. 371, 382; *Shively* v. *Bowlby,* 152 U. S. 1, 40, 58; *St. Anthony Falls Water Power Co.* v. *Water Commissioners,* 168 U. S. 349, 358; *Scott* v. *Lattig,* 227 U. S. 229, 243.

The question of the navigability in fact of non-tidal streams is sometimes a doubtful one. It has been held in effect that what are navigable waters of the United States, within the meaning of the act of Congress, in contradistinction to the navigable waters of the States, depends upon whether the stream in its ordinary condition affords a channel for useful commerce. *The Montello,* 20 Wall. 430; *Leovy* v. *United States,* 177 U. S. 621, 632; *United States* v. *Rio Grande,* 174 U. S. 690, 698; *South Carolina* v. *Georgia,* 93 U. S. 4, 10; *The Parsons,* 191 U. S. 17, 28.

But it results from the principles already referred to that what shall be deemed a navigable water within the meaning of the local rules of property is for the determination of the several States. Thus the State of California, if she sees fit, may confer upon the riparian owners the title to the bed of any navigable stream within her borders.

Now, a California statute of April 23, 1880, c. 122, Laws 1880, p. 136,[1] declared the Klamath River to be navigable from its mouth to the town of Orleans Bar, which is above the *locus in quo.* But this was repealed by act of February 24, 1891, c. 14, Laws 1891, p. 10; and by an act of March 11, 1891, c. 92, Laws 1891, p. 96 (Political Code, § 2349), an enumeration was made of all

---

[1] See p. 708, *post.*

the navigable rivers of the State. This is held by the Supreme Court of that State to be exclusive, so that no other rivers are navigable under the laws of California. *Cardwell* v. *County of Sacramento,* 79 California, 347, 349. The Klamath River is not among those thus enumerated, and it must therefore be treated as not navigable in law. And it will be observed that it was thus placed in the category of non-navigable streams prior to President Harrison's order of October 16, 1891, by which the Extension of the Hoopa Valley Reservation was established.

In the important case of *Lux* v. *Haggin* (1886), 69 California, 255, 335, 337, the Supreme Court of California, after pointing out that upon the admission of that State into the Union "upon an equal footing" with the original thirteen States, she became seised of all the rights of sovereignty, jurisdiction, and eminent domain which those States possessed, and that under § 3 of the act of Admission (9 Stat. 452, c. 50) the lands of the United States not reserved or purchased for fortifications, etc., are held as are held the lands of private persons, with the exception that the State cannot interfere with the primary disposal of them nor tax them, and that the navigable waters are common highways, free to the inhabitants of the State and to citizens of the United States—proceeded to declare that whether this act did or did not operate as an immediate transfer of the property in non-navigable rivers to the Federal Government, the legislature of the State, on April 13, 1850, passed an act adopting the common law of England, so far as not repugnant to or inconsistent with the Constitution of the United States or the constitution or laws of the State of California, as the rule of decision in all courts of the State, and that in view of the subsequent judicial history of the State this act must be held to have operated, at least from the admission of the State into the Union, as a transfer to all riparian proprietors, including the United States, of the property of the State,

if any she had, in the non-navigable streams and the soil beneath them. The authority of this decision was recognized in *Packer* v. *Bird*, 137 U. S. 661, 669. We are not able to find that the doctrine declared in it has since been departed from by the courts of the State.

It thus appears, from the course of legislation and adjudication by the appropriate authorities of California, not only that the Klamath River has been placed in the category of non-navigable streams, but that the title of the United States to the bed of it where it runs through the public lands has been distinctly recognized. In short, by the acts of legislation mentioned, as construed by the highest court of the State—(a) the act of 1850, adopting the common law and thereby transferring to all riparian proprietors (or confirming in them) the ownership of the non-navigable streams and their beds, and (b) the acts of February 24 and of March 11, 1891, declaring in effect that the Klamath River is a non-navigable stream—California has vested in the United States, as riparian owner, the title to the bed of the Klamath, if in fact it be a navigable river. If in fact it be non-navigable, it is obvious that the same result flows from the mere adoption of the common law.

From this it results that whether the river be or be not navigable in fact, the river bed is to be deemed as included within the Extension of the Hoopa Valley Reservation.

3. But the order establishing the Extension as a reservation (Exec. Ord. Ind. Reserv. 1912, p. 39, 1 Kappler, 815), contained the proviso—"That any tract or tracts included within the above described boundaries, to which valid rights have attached under the laws of the United States, are hereby excluded from the reservation as hereby extended."

Upon the trial a certified copy of a notice of the location of a "mining claim" filed October 20, 1888, in the Recorder's office of Humboldt County, was introduced in

evidence, wherein notice was given by eight persons named therein—"that the undersigned, having complied with the requirements of Chapter A of Title 32, of the Revised Statutes of the United States, and the local customs, laws, and regulations, have located twenty acres each of placer mining ground, situated in the County of Humboldt and State of California, and described as follows." Then followed a description showing exterior limits conforming to legal subdivisions of the public lands; and from other evidence it appeared that the land thus claimed bordered upon, but did not include, the river at the *locus in quo.* There is no other evidence respecting this mining claim or location excepting the testimony of a witness to the effect that there was "a mine" in the vicinity of the Indian village where the crime occurred; the character or location of the mine not being otherwise described.

It is doubtful whether there is any evidence that would have supported a finding that the crime was committed elsewhere than within the river bed. Waiving this point, however, we will consider the effect of the mining location, upon the theory that the crime may have occurred within the limits of the claim.

By § 2329, Rev. Stat., placer claims are "subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as are provided for vein or lode claims." By § 2330, "two or more persons, or associations of persons, having contiguous claims . . . may make joint entry thereof; but no location of a placer-claim, made after the ninth day of July, eighteen hundred. and seventy, shall exceed one hundred and sixty acres for any one person or association of persons, which location shall conform to the United States surveys." By § 2331, placer-claims upon surveyed lands, and conforming to legal subdivisions, require no further survey or plat, and no such location shall include more than twenty acres for each individual claimant. By § 2332, where such per-

sons or associations have held and worked their claim for a period equal to the time prescribed by the statute of limitations for mining-claims by the local law, evidence of such possession and working shall establish a right to patent, in the absence of adverse claim. The circumstances, conditions, and proceedings referred to in § 2329 are those set forth in the preceding sections beginning with § 2318. The chief requirements are,—the discovery of a valuable mineral deposit within the limits of the claim (§§ 2318-2320); the claimants must be citizens of the United States, or must have declared their intention to become such (§§ 2319, 2321); "the location must be distinctly marked on the ground so that its boundaries can be readily traced" (§ 2324); and a certain amount of work must be done in accordance with local regulations, and "on each claim located after the tenth day of May, 1872, and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year" (§ 2324).

The prime requisites are, the discovery of a valuable mineral deposit, an actual taking possession thereof, and the performance of the requisite amount of development work. *Erhardt* v. *Boaro*, 113 U. S. 527, 535; *Black* v. *Elkhorn Mining Co.*, 163 U. S. 445, 450; *Chrisman* v. *Miller*, 197 U. S. 313, 321.

The history of the legislation of Congress upon the subject, and the effect thereof, are referred to in numerous decisions of this court, among them *Belk* v. *Meagher*, 104 U. S. 279, 284; *St. Louis Smelting Co.* v. *Kemp*, 104 U. S. 636, 649; *Gwillim* v. *Donnellan*, 115 U. S. 45, 50; *Del Monte Mining Co.* v. *Last Chance Mining Co.*, 171 U. S. 55, 75, etc. See also *Jennison* v. *Kirk*, 98 U. S. 453, 457; *Chambers* v. *Harrington*, 111 U. S. 350, 353; *Hammer* v. *Garfield Mining Co.*, 103 U. S. 291, 299; *Dahl* v. *Raunheim*, 132 U. S. 260; *Clipper Mining Co.* v. *Eli Mining Co.*, 194 U. S. 220, 227.

Of course, under this legislative scheme, a mining claim may be abandoned by failure to do the required development work. *Chambers* v. *Harrington*, 111 U. S. 350, 353; *Black* v. *Elkhorn Mining Co.*, 163 U. S. 445, 450; *Erhardt* v. *Boaro*, 113 U. S. 527, 535.

The evidence in the record is altogether too meagre and indefinite to furnish support for a finding that at the time of the Executive Order of October 16, 1891, or at any time, valid rights had attached to the placer-claim above referred to.

Next, it appears from the evidence that prior to October, 1891, the Board of Supervisors of Humboldt County created a school district which included within its bounds the place where the homicide occurred, and that after October, 1891, the county created, out of the district mentioned, a second school district, which included the place in question. It was in evidence that this school district was maintained by the county, and not by the Government, down to the time of the trial herein. From this it is argued that the State and county had assumed jurisdiction over the land on each side of the Klamath River for school purposes before the enlargement of the Hoopa Valley Reservation, and that the State still exercises the right to maintain a school there.

But we are clear that the creation and maintenance of such a school district by the State could not in anywise impair the title of the United States to the lands included in such district, or limit the authority of the United States over such lands when set apart for an Indian reservation. The Act of Admission, September 9, 1850; 9 Stat. 452, c. 50, § 3 provided— "That the said State of California is admitted into the Union upon the express condition that the people of said State, through their legislature or otherwise, shall never interfere with the primary disposal of the public lands within its limits, and shall pass no law and do no act whereby the title of

the United States to, and right to dispose of, the same shall be impaired or questioned;" etc. By act of March 3, 1853, 10 Stat. 244, 246, c. 145, § 6, Congress granted to the State for the purposes of public schools sections 16 and 36 in each township. And by act of July 23, 1866, 14 Stat. 218, 220, c. 219, § 6, Congress gave to the State "the right to select for school purposes other lands in lieu of such sixteenth and thirty-sixth sections as were settled upon prior to survey, reserved for public uses, covered by grants made under Spanish or Mexican authority, or by other private claims," etc. It affirmatively appears, however, that the *locus in quo* was not within either the sixteenth or the thirty-sixth section, and it does not appear that it was selected by the State as "lieu" lands. Therefore the existence of the state school district is without present significance. For, as was pointed out in the *Wilson Case*, 140 U. S. p. 578, the words "sole and exclusive jurisdiction," as employed in § 2145, Rev. Stat., do not mean that the United States must have sole and exclusive jurisdiction over the Indian country in order that that section may apply to it; the words are used in order to describe the laws of the United States which by that section are extended to the Indian country.

4. It is contended for plaintiff in error that the term "Indian country" is confined to lands to which the Indians retain their original right of possession, and is not applicable to those set apart as an Indian reservation out of the public domain, and not previously occupied by the Indians.

Sections 2145 and 2146 are found in Title XXVIII of the Revised Statutes, which title relates to Indians, and within chap. 4, the sub-title of which is "Government of Indian Country." Section after section in that chapter contains provisions of law applicable only to Indian country, and yet the act contains no definition of that term. In the Indian Intercourse Act of June 30, 1834, 4

Stat. 729, c. 161, the first section defined the "Indian country" for the purposes of that act. But this section was not reënacted in the Revised Statutes, and it was therefore repealed by § 5596, Rev. Stat. *Ex parte Crow Dog,* 109 U. S. 556, 561; *United States* v. *LeBris,* 121 U. S. 278, 280; *Clairmont* v. *United States,* 225 U. S. 551, 557. Under these decisions the definition as contained in the act of 1834 may still "be referred to in connection with the provisions of its original context that remain in force, and may be considered in connection with the changes which have taken place in our situation, with a view of determining from time to time what must be regarded as Indian country where it is spoken of in the statutes." With reference to country that was formerly subject to the Indian occupancy, the cases cited furnish a criterion for determining what is "Indian country." But "the changes which have taken place in our situation" are so numerous and so material, that the term cannot now be confined to land formerly held by the Indians, and to which their title remains unextinguished. And, in our judgment, nothing can more appropriately be deemed "Indian country," within the meaning of those provisions of the Revised Statutes that relate to the regulation of the Indians and the government of the Indian country, than a tract of land that, being a part of the public domain, is lawfully set apart as an Indian reservation.

5. Is the killing of an Indian by a person not of Indian blood, when committed upon an Indian reservation within the limits of a State, cognizable in the Federal courts?

It is insisted by plaintiff in error that § 9 of the act of March 3, 1885 (set forth in full in the marginal note, above), which declares that "all such Indians committing any of the above crimes (including murder) against the person or property of another Indian or other person within the boundaries of any State of the United States, and within the limits of any Indian reservation, shall be

subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States"—constitutes the only legislation of Congress providing for punishing the crime of murder when committed upon an Indian within the limits of an Indian reservation. The argument is that this act operated to repeal § 2145, Rev. Stat., which extended to the Indian country certain general laws of the United States as to the punishment of crimes. This argument is plainly untenable. The act of 1885, of itself, provides for the punishment of crimes committed by Indians only. So far from impliedly repealing § 2145, Rev. Stat., it manifestly repeals in part the limitation that was imposed by § 2146 upon the effect of § 2145.

It was pointed out by this court in *Ex parte Crow Dog* (1883), 109 U. S. 556, 571, that "The provisions now contained in §§ 2145 and 2146 of the Revised Statutes were first enacted in § 25 of the Indian Intercourse Act of June 30, 1834, 4 Stat. 729, 733, c. 161. Prior to that, by the act of May 19, 1796, 1 Stat. 469, c. 30, and the act of March 30, 1802, 2 Stat. 139, c. 13, offenses committed by Indians against white persons, and by white persons against Indians, were specifically enumerated and defined, and those by Indians against each other were left to be dealt with by each tribe for itself, according to its local customs. The policy of the government in that respect has been uniform." The point decided was that certain general expressions in the treaty with the Sioux Indians made in 1868 had not the effect of impliedly repealing the express limitation contained in § 2146. As a result, Crow Dog went unpunished by the Federal authority for the murder of Spotted Tail, another Indian. And this no doubt was one of the causes that led to the enactment of § 9 of the act of March 3, 1885, 23 Stat. 385, as was pointed out in *United States* v. *Kagama*, 118 U. S. 375,

383, where § 9 was sustained as valid and constitutional in both its branches, namely, that which provides for the punishment of the crimes enumerated when committed by Indians within the Territories, and that which provides for the punishment of the same crimes when committed by an Indian on an Indian reservation within a State of the Union; and see *In re Wilson,* 140 U. S. 575, 578.

Section 2145, Rev. Stat., in connection with § 5339, plainly includes within its terms the offense of murder committed against the person of an Indian within an Indian reservation by a person not of Indian blood, but it is contended that the admission of California into the Union "on an equal footing with the original States," without any express reservation by Congress of governmental jurisdiction over the public lands contained within her borders, conferred upon the State undivided authority to punish crimes committed upon those lands, even when set apart for an Indian reservation, excepting crimes committed by the Indians. Reference is made to the cases of *United States* v. *McBratney,* 104 U. S. 621, and *Draper* v. *United States,* 164 U. S. 240, where it was held, in effect, that the organization and admission of States qualified the former Federal jurisdiction over Indian country included therein by withdrawing from the United States and conferring upon the States the control of offenses committed by white people against whites, in the absence of some law or treaty to the contrary. In both cases, however, the question was reserved as to the effect of the admission of the State into the Union upon the Federal jurisdiction over crimes committed by or against the Indians themselves. (104 U. S. 624; 164 U. S. 247.) Upon full consideration we are satisfied that offenses committed by or against Indians are not within the principle of the *McBratney* and *Draper Cases.* This was in effect held, as to crimes committed *by* the Indians, in the *Kagama Case,*

118 U. S. 375, 383, where the constitutionality of the second branch of § 9 of the act of March 3, 1885, 23 Stat. 385, was sustained upon the ground that the Indian tribes are the wards of the nation. This same reason applies— perhaps *a fortiori*—with respect to crimes committed by white men against the persons or property of the Indian tribes while occupying reservations set apart for the very purpose of segregating them from the whites and others not of Indian blood.

The result is that, in our opinion, the offense with which the plaintiff in error was charged was punishable in the Federal courts under §§ 2145 and 5339, Rev. Stat.

6. The only remaining question arises out of the exclusion by the trial judge of testimony offered by the plaintiff in error for the purpose of showing that one Joe Dick, an Indian, since deceased, had confessed that it was he who had shot Chickasaw. Since the circumstances of the crime, as detailed in the evidence for the Government, strongly tended to exclude the theory that more than one person participated in the shooting, the Dick confession, if admissible, would have directly tended to exculpate the plaintiff in error. By way of foundation for the offer, plaintiff in error showed at the trial that Dick was dead, thereby accounting for his not being called as a witness, and showed in addition certain circumstances that, it was claimed, pointed to him as the guilty man, viz., that he lived in the vicinity and therefore presumably knew the habits of Chickasaw; that the human tracks upon a sand bar at the scene of the crime led in the direction of an acorn camp where Dick was stopping at the time, rather than in the direction of the home of the plaintiff in error; and that beside the track there was at one point an impression as of a person sitting down, indicating, as claimed, a stop caused by shortness of breath, which would be natural to Dick, who was shown to have been a sufferer from consumption.

Hearsay evidence, with a few well recognized exceptions, is excluded by courts that adhere to the principles of the common law. The chief grounds of its exclusion are, that the reported declaration (if in fact made) is made without the sanction of an oath, with no responsibility on the part of the declarant for error or falsification, without opportunity for the court, jury, or parties to observe the demeanor and temperament of the witness, and to search his motives and test his accuracy and veracity by cross-examination, these being most important safeguards of the truth, where a witness testifies in person, and as of his own knowledge; and, moreover, he who swears in court to the extra-judicial declaration does so (especially where the alleged declarant is dead) free from the embarrassment of present contradiction and with little or no danger of successful prosecution for perjury. It is commonly recognized that this double relaxation of the ordinary safeguards must very greatly multiply the probabilities of error, and that hearsay evidence is an unsafe reliance in a court of justice.

One of the exceptions to the rule excluding it is that which permits the reception, under certain circumstances and for limited purposes, of declarations of third parties made contrary to their own interest; but it is almost universally held that this must be an interest of a pecuniary character; and the fact that the declaration, alleged to have been thus extra-judicially made, would probably subject the declarant to a criminal liability is held not to be sufficient to constitute it an exception to the rule against hearsay evidence. So it was held in two notable cases in the House of Lords— *Berkeley Peerage Case* (1811), 4 Camp. 401; *Sussex Peerage Case* (1844), 11 Cl. & Fin. 85, 103, 109; 8 Eng. Reprint, 1034, 1042,—recognized as of controlling authority in the courts of England.

In this country there is a great and practically unanimous weight of authority in the state courts against ad-

mitting evidence of confessions of third parties made out of court and tending to exonerate the accused. Some of the cases are cited in the margin.[1] A few of them (*West v. State*, 76 Alabama, 98; *Davis v. Commonwealth*, 95 Kentucky, 19; and *People v. Hall*, 94 California, 595, 599) are precisely in point with the present case, in that the alleged

---

[1] ALABAMA—*Smith v. State*, 9 Alabama, 990, 995; *Snow v. State*, 54 Alabama, 138; *Snow v. State*, 58 Alabama, 372, 375; *Alston v. State*, 63 Alabama, 178, 180; *West v. State*, 76 Alabama, 98; *Owensby v. State*, 82 Alabama, 63, 64.

CALIFORNIA—*People v. Hall*, 94 California, 595, 599.

GEORGIA—*Lyon v. State*, 22 Georgia, 399, 401; *Daniel v. State*, 65 Georgia, 199, 200; *Kelly v. State*, 82 Georgia, 441, 444; *Delk v. State*, 99 Georgia, 667, 671; *Lowry v. State*, 100 Ga. 574; *Robinson v. State*, 114 Georgia, 445, 447.

INDIANA—*Bonsall v. State*, 35 Indiana, 460, 463; *Jones v. State*, 64 Indiana, 473, 485; *Hauk v. State*, 148 Indiana, 238, 262; *Siple v. State*, 154 Indiana, 647, 650.

KANSAS—*State v. Smith*, 35 Kansas, 618, 621.

KENTUCKY—*Davis v. Commonwealth*, 95 Kentucky, 19.

LOUISIANA—*State v. West*, 45 La. Ann. 928, 931.

MARYLAND—*Munshower v. State*, 55 Maryland, 11, 19.

MASSACHUSETTS—*Commonwealth v. Chabbock*, 1 Massachusetts, 143; *Commonwealth v. Felch*, 132 Massachusetts, 22; *Commonwealth v. Chance*, 174 Massachusetts, 245, 251.

MISSOURI—*State v. Evans*, 55 Missouri, 460; *State v. Duncan*, 116 Missouri, 288, 311; *State v. Hack*, 118 Missouri, 92, 98.

NEW YORK—*Greenfield v. People*, 85 N. Y. 75, 87; *People v. Schooley*, 149 N. Y. 99, 105.

NORTH CAROLINA—*State v. May*, 15 N. C. (4 Dev.) 328, 332; *State v. Duncan*, 28 N. C. (6 Ired.) 236, 239; *State v. White*, 68 N. C. 158; *State v. Haynes*, 71 N. C. 79, 84; *State v. Bishop*, 73 N. C. 44, 46; *State v. Beverly*, 88 N. C. 632.

OREGON—*State v. Fletcher*, 24 Oregon, 295, 300.

TENNESSEE—*Wright v. State*, 17 Tennessee, (9 Yerg.) 342, 344; *Rhea v. State*, 18 Tennessee, (10 Yerg.) 257, 260; *Peck v. State*, 86 Tennessee, 259, 267.

TEXAS—*Wood v. State* (Texas Crim. App.), 26 S. W. Rep. 625.

VERMONT—*State v. Marsh*, 70 Vermont, 288; *State v. Totten*, 72 Vermont, 73, 76.

declarant was shown to be deceased at the time of the trial. In *West* v. *State* the defendant offered to prove by a witness that he heard one Jones say on his death bed that he had killed Wilson, the deceased. The Supreme Court sustained the ruling of the trial judge excluding the evidence. In *Davis* v. *Commonwealth,* the offer excluded was to prove by a witness that one Pearl confessed to him on his death bed that he had killed the person for whose murder Davis was on trial. The Court of Appeals of Kentucky affirmed the conviction. In *People* v. *Hall* it appeared that defendant and one Kingsberry were arrested together for an alleged burglary, attempted to escape, were fired upon and wounded by one of the captors; that a physician was sent for to treat them, and that Kingsberry died from the effects of his wound before any complaint was filed against either of the parties. "In his own behalf the defendant offered to prove that after a careful examination the physician was satisfied that Kingsberry's wounds were necessarily fatal, and that he so informed him at the time; that Kingsberry admitted to the physician that he fully realized that he was mortally wounded and was on the point of death, and had given up all hope of ever getting well; that he was conscious of death, and that thus having a sense of impending death, and without hope of reward, he made a full, free, and complete confession to said physician in relation to this alleged crime, stating that he himself had planned the entire scheme, and that Hall had nothing to do with it and was not connected with the guilt, and was in all respects innocent of any criminal act or intent in the matter." This evidence was excluded, and the Supreme Court of California sustained the ruling, saying: "The rule is settled beyond controversy that in a prosecution for crime the declaration of another person that he committed the crime is not admissible. Proof of such declarations is mere hearsay evidence, and is always excluded, whether

the person making it be dead or not" (citing cases that are among those included in the note).

We do not consider it necessary to further review the authorities, for we deem it settled by repeated decisions of this court, commencing at an early period, that declarations of this character are to be excluded as hearsay.

*Mima Queen and Child* v. *Hepburn* (1813), 7 Cranch, 290, 295, 296, 297, was a suit in which the petitioners claimed freedom, and certain depositions were rejected by the trial court as hearsay. This court, speaking through Chief Justice Marshall, said: "These several opinions of the court (meaning the trial court) depend on one general principle. The decision of which determines them all. It is this: that hearsay evidence is incompetent to establish any specific fact, which fact is in its nature susceptible of being proved by witnesses who speak from their own knowledge. . . . . It was very justly observed by a great judge [1] that 'all questions upon the rules of evidence are of vast importance to all orders and degrees of men; our lives, our liberty, and our property are all concerned in the support of these rules, which have been matured by the wisdom of ages, and are now revered from their antiquity and the good sense in which they are founded.' One of these rules is that 'hearsay' evidence is in its own nature inadmissible. That this species of testimony supposes some better testimony which might be adduced in the particular case, is not the sole ground of its exclusion. Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover combine to support the rule that hearsay evidence is totally inadmissible. . . . The danger of admitting hearsay evidence is sufficient to admonish courts of justice against lightly yielding to the

---

[1] The reference is to the opinion of Lord Kenyon, C. J., in *The King* v. *Eriswell* (1790), 3 T. R. 721,

introduction of fresh exceptions to an old and well-established rule; the value of which is felt and acknowledged by all. If the circumstance that the eye witnesses of any fact be dead should justify the introduction of testimony to establish that fact from hearsay, no man could feel safe in any property, a claim to which might be supported by proof so easily obtained. . . . This court is not inclined to extend the exceptions further than they have already been carried."

This decision was adhered to in *Davis* v. *Wood* (1816), 1 Wheat. 6, 8; *Lessee of Scott* v. *Ratliffe* (1831), 5 Pet. 81, 86; *Ellicott* v. *Pearl* (1836), 10 Pet. 412, 436, 437; *Wilson* v. *Simpson* (1850), 9 How. 109, 121; *Hopt* v. *Utah* (1883), 110 U. S. 574, 581. And see *United States* v. *Mulholland*, 50 Fed. Rep. 413, 419.

The evidence of the Dick confession was properly excluded.

No error appearing in the record, the judgment is

*Affirmed.*

MR. JUSTICE VAN DEVANTER concurs in the result.

MR. JUSTICE HOLMES, with whom concur MR. JUSTICE LURTON and MR. JUSTICE HUGHES, dissenting.

The confession of Joe Dick, since deceased, that he committed the murder for which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make any one outside of a court of justice believe that Donnelly did not commit the crime. I say this, of course, on the supposition that it should be proved that the confession really was made, and that there was no ground for connecting Donnelly with Dick.—The rules of evidence in the main are based on experience, logic and common sense, less hampered by history than some parts of the substantive

law.   There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder, it is far more calculated to convince than dying declarations, which would be let in to hang a man, *Mattox* v. *United States*, 146 U. S. 140; and when we surround the accused with so many safeguards, some of which seem to me excessive, I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight.   The history of the law and the arguments against the English doctrine are so well and fully stated by Mr. Wigmore that there is no need to set them forth at greater length. 2 Wigmore, Evidence, §§ 1476, 1477.