**UNITED STATES of America**

v.

**Charles Edward LAWRENSON and Robert L. Couch.**

**Cr. No. 24975.**

United States District Court
D. Maryland.

March 30, 1961.

Leon H. A. Pierson, U. S. Atty., and John R. Hargrove, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

1. In violation of 18 U.S.C.A. § 2113 (a), (b), (d), (f) and § 2.

2. Bair, a former Assistant United States Attorney, and his younger associate, Russell R. Reno, Jr., represented

Russell R. Reno, Jr., and John D. Alexander, Jr., Baltimore, Md., for defendant Lawrenson.

THOMSEN, Chief Judge.

The four count indictment in this case charged defendants Couch and Lawrenson with armed robbery [1] of the County Trust Company of Maryland, Mechanicsville Branch, in St. Mary's County, Maryland. Couch plead guilty and testified at the trial of Lawrenson, who was found guilty by a jury on all four counts and sentenced to imprisonment for twenty years. Before sentence Lawrenson filed a motion for a new trial and renewed his motion for a judgment of acquittal. These motions were denied for reasons stated orally during and after the argument thereon (Tr. 753–798). He appealed his conviction, but at his request the Court of Appeals postponed the argument on appeal and returned the record to this Court so that he might file a motion for new trial on the ground of newly discovered evidence. He filed such a motion, supported by affidavits of Robert Lee Cutler and Robert R. Bair.[2] Defendant now also contends that the government failed to disclose to him evidence which might have been admissible and useful to the defense. The court arranged to have Cutler brought to the hearing from the Ohio prison where he is presently confined. Testimony was taken and the points were fully briefed and argued.

The legal principles controlling such motions have been recently reviewed and restated by the Fourth Circuit in Jones v. United States, 1960, 279 F.2d 433, and Mills v. United States, 1960, 281 F.2d 736. The evidence will be summarized and discussed in the light of those principles.

The bank was robbed of some $28,037 on September 4, 1959. Couch was arrested the following day, and Lawrenson was arrested on September 6, 1959, in a hotel

Lawrenson at the trial. Reno and John D. Alexander, Jr., have been appointed to represent Lawrenson on his appeal, and they have also represented him in connection with this motion for new trial.

room at Miami Beach, Florida, which he was sharing with a woman generally referred to as Kay Merrick, having registered as Mr. and Mrs. Merrick. At the time he was arrested the agents seized $22,503 in various cases and a shoe box, $213 in Lawrenson's wallet, an automatic pistol, some ammunition, a receipt from a Washington store showing payment for the ammunition, credit cards, tickets and driver's licenses in the name of Paul J. McCray, Virginia and South Carolina and U. S. Forces in Germany license plates, and various other items.

On the motion of Lawrenson, Judge Watkins reluctantly suppressed this evidence, Tr. 266–281, and arranged for the case to be tried before me.

At the trial Couch testified that on September 3, 1959, the day before the robbery, he drove a green Cadillac, procured by Lawrenson, and Lawrenson drove Couch's black Chevrolet to Hughesville, Maryland (a few miles from Mechanicsville), where they arranged to leave the Chevrolet in a hotel parking lot overnight and went in the Cadillac to the Mechanicsville bank, which Couch entered leaving Lawrenson outside. They did not rob the bank that day, but returned to Washington in the Cadillac. The next day, dressed in engineers' overalls and caps, wearing sunglasses, and armed with guns supplied by Lawrenson, they drove in the Cadillac to the bank. Couch entered first and assembled the three women employees into a group behind the counter; Lawrenson then entered, the women were forced to lie on the floor, Couch taped their mouths and Lawrenson gathered the money into a shopping bag. Lawrenson and Couch then drove to Hughesville, changing into ordinary street clothes on the way. They stopped on the hotel parking lot, transferred the bags containing the money, overalls, etc., from the Cadillac to the Chevrolet and left for Washington with Lawrenson driving. Lawrenson dropped Couch off at the Greyhound Bus Station in Washington promising to meet him at a certain corner in Washington at 10:00 that evening, to give Couch his share of the money, but Lawrenson did not appear.

Couch's testimony was corroborated and supplemented in a number of ways. Lawrenson was identified as the man who rented the green Cadillac from Hertz in Boston on August 28, using an American Express credit card of Paul J. McCray. After much testimony had been introduced to prove these facts, they were admitted by Lawrenson's counsel, who also conceded that Lawrenson still had McCray's card at the time of the robbery. On September 3, a Maryland State trooper had noticed a green Cadillac and a black Chevrolet, each with only one license tag. He stopped the Chevrolet, the driver presented a driver's license in the name of McCray, but the trooper, who issued a summons, identified the defendant at the trial as Lawrenson. The witness Muller identified Lawrenson as the man he saw sitting in a Cadillac in front of the bank at the crucial time on September 4. One of the bank employees identified Lawrenson as the second robber. The witness Turner, whose job kept her near a window opposite the hotel parking lot in Hughesville, identified Lawrenson as the man who transferred two or three bags from the Cadillac to the Chevrolet on September 4, while Couch did something to the front license plate.

Lawrenson did not take the stand, nor did M's Merrick, although she and Mrs. Lawrenson sat together in court throughout the trial.[3] The defense was an alibi. McCray, who turned out to be a member of the Lawrenson-Merrick coterie or gang, had been called by the government and had testified nervously that he had not used his credit card to obtain the Cadillac in Massachusetts. After spending the luncheon recess with M's Merrick and Mrs. Lawrenson, he was called by the defense and testified even more nervously that at about the time of the rob-

---

3. It may be noted here that Lawrenson is married, and the friendly relationship throughout the proceedings between Mrs. Lawrenson and M's Merrick is, to say the least, remarkable.

bery he had called at M's Merrick's apartment and the door had been opened by Lawrenson in purple pajamas. I felt at the time and still feel that it was as clear a case of perjury as I have ever heard. The jury evidently did not believe this testimony either.

Defendant's counsel also tried to suggest on cross-examination of government witnesses and in the closing argument, that Robert Cutler, who has been variously described as a son, a foster son or a nephew of M's Merrick, was the other robber, although there was no evidence to that effect. There was evidence that Cutler was on parole from an Ohio prison, living in M's Merrick's apartment in September 1959, that he had driven to Baltimore with Couch in Couch's car a few days before the robbery, and that he knew the whole crowd.

### Lawrenson's Contention that the Government Improperly Withheld Evidence

Lawrenson now contends that the government improperly withheld from him information that Cutler had been arrested in Texas as a parole violator shortly before the trial, and suppressed evidence which Lawrenson's counsel claim implicated Cutler.

It is practically conceded, and I find as a fact, that none of the counsel on either side knew where Cutler was at the time of the trial. There had been some talk about him between counsel, but counsel for defendant did not ask counsel for the government to help locate him, nor whether the F.B.I. knew where he was. The only evidence which the government ever had connecting Cutler with the offense was one of his fingerprints on the Virginia license plate found in Lawrenson's possession in Miami and suppressed at Lawrenson's request. Cutler had been interviewed by the F.B.I. shortly after the robbery, and had explained that fingerprint by saying that on the trip to Baltimore with Couch, mentioned in the evidence at the trial, he had noticed a gun and some out-of-state license plates in the car, and had handled one or two of the items. Since there was nothing to show that he had had any part in the crime or that he knew any material facts, the government did not consider him a material witness in this case. A flag was placed on his fingerprint card in connection with the Ohio parole violation occasioned by his leaving Washington without permission from his probation officer, but no flag was placed on the card in connection with this case. Cutler was arrested in Texas early in May 1960, a few days before Lawrenson's trial began, and was returned to Ohio as a parole violator. His probation officer knew that the F.B.I. had at one time been interested in Cutler, and notified one of the F.B.I. agents in Washington that he had been arrested, but neither counsel for the government in the instant case nor counsel for Lawrenson had said that they wanted any more information about Cutler, so the agent did not pass the word along to Baltimore.

Lawrenson's attorney, Bair, has filed an affidavit stating that he had asked M's Merrick where Cutler was, and she had said she did not know. Of course, I accept Bair's word, but I do not accept M's Merrick's. In view of the scheming between M's Merrick and the Lawrensons at the time of the crime, during the trial, and afterwards, it is at least equally plausible that M's Merrick, who was Cutler's mother or foster mother, knew before the trial was over that he had been arrested in Texas, but withheld this information from counsel, so that counsel could insinuate to the jury that her son was the robber, based upon such information—true, false, or partly true—as M's Merrick and the Lawrensons chose to supply.

The fact that one of Cutler's fingerprints was on one of the license tags (also seized from Lawrenson and suppressed at his request) was adequately explained by Cutler to the F.B.I. It might possibly support an inference that Cutler was implicated in the affair in some way, but it does not contradict any of the evidence which proved that Lawrenson was one of the robbers.

■ The failure of the government to notify defendant's counsel of the arrest of Cutler or of the fact that his fingerprint was on one of the license tags found in Lawrenson's possession and suppressed at his request is not subject to criticism of any sort, and did not amount to an improper withholding of evidence or information from the defendant.

■ Couch testified at the trial that Lawrenson furnished the guns for the robbery. He was not asked anything about ammunition by either side. Lawrenson now complains that the government did not tell his counsel that Couch had told an F.B.I. agent that one of the guns had been in the car on the trip Couch and Cutler made to Baltimore several days before the robbery, and that Couch had bought some ammunition at the request of Cutler. The receipted bill for the ammunition had been found in Lawrenson's possession in Miami, and had been suppressed at his request. These facts support the inference that Lawrenson had sent a message to Couch through Cutler to buy the ammunition; they do not disprove Couch's testimony that the guns had been furnished by Lawrenson.

Neither the government nor the defendant ever requested that the gun found in Lawrenson's possession and suppressed at his request be processed for fingerprints.

No reason is perceived why the government was under any obligation to disclose these facts to the defendant.

### The Alleged Newly Discovered Evidence

In September 1960, after the appeal had been filed one of the Lawrenson-Merrick trio gave Lawrenson's present counsel some information which caused one of them, Reno, to visit Cutler in the Ohio prison and to obtain from him an affidavit which was filed with the motion.[4]

No one was present to represent Cutler at the time he made the affidavit, and it is by no means sure that he realized the possible effect on himself of what he was doing.[5] Before Cutler was called to the stand at the hearing on the pending motion, I appointed counsel to represent him, and he claimed his privilege under the Fifth Amendment with respect to all questions dealing with the giving of the affidavit and the information contained therein. His counsel stated that his answers might implicate him in some way in the crime, or might involve him in a charge of perjury for giving a false affidavit to be filed in this proceeding. Defendant's counsel then offered the affidavit itself in evidence. The government objected, and the ruling on the objection was reserved.

■ Such an affidavit is ordinarily not admissible, because it is hearsay. See e. g. Donnelly v. United States, 228 U.S. 243, 273, 33 S.Ct. 449, 57 L.Ed. 820; Smith v. United States, 4 Cir., 106 F.2d 726. However, to avoid possible further delay, I will discuss the case as though it were admissible.

■ The affidavit is to the following effect: (1) that Cutler was living with his mother, M's Merrick, in Washington, on parole, from August 17, 1959, until the latter part of October 1959, when he "broke" parole, left the Washington area and notified no one of his whereabouts; (2) that on Wednesday, September 2, 1959, he purchased the clothes used by the robbers, placed them in the trunk of Couch's car, where he had previously placed a .32 caliber pistol of foreign make which belonged to him, a gas pistol used for shooting tear gas which belonged to him, and three pairs of cowboy boots which belonged to him; (3) that during the evening of September 4, 1959, he met

---

4. When Reno returned to Baltimore he rewrote the original affidavit, adding an item which had been discussed but not originally included. The second affidavit was the one which was filed and offered.

5. Reno was acting for Lawrenson and was in a difficult position; he evidently did not feel any obligation to Cutler beyond the obligation not to answer his questions dishonestly.

724

Couch at a motel, where Couch gave him $350 in repayment of a loan and showed him a small suitcase full of bundles of money of various denominations, which Couch said was from the bank job; (4) that when he was questioned by the F.B.I. in September 1959, he was told that his fingerprints had been found on the black Chevrolet belonging to Couch and also on a .32 caliber pistol, a gas pistol, one set of South Carolina license plates, and one set of United States Government in Germany license plates, which the agent told him were believed to have been used in the robbery and which had been taken from one of the suspects.

The facts set out in (1) have never been disputed by anyone, and are not material to any issue in the case.

The statements set out in (2), if true, would implicate Cutler as an accessory to the crime but would not show or tend to show that Lawrenson was not also implicated. Particularly, they would not show that Lawrenson was not one of the men who entered the bank and who transferred the loot from one car to the other at Hughesville. The reasonable inference would be that Cutler had bought the clothes for Lawrenson and loaned his pistols to Lawrenson. It would not disprove Couch's testimony that so far as he knew Lawrenson was supplying the weapons.

The material in (3) does contradict the testimony of Couch that Lawrenson failed to meet him on the evening of September 4, as promised, and that Couch had not received any of the money. But, since the affidavit does not say that Couch had all of the money or that Cutler had any of it, except the $350 said to have been paid to him by Couch, it would not disprove the fact that Lawrenson had been one of the robbers and had gone to Florida with most of the money. This is especially true since Lawrenson claims or admits, and has claimed or admitted all along, that the money was his and that the pistols referred to in Cutler's affidavit were his (Lawrenson's).

The statement in (4) as to what the F.B.I. told Cutler about his fingerprints is flatly contradicted by the F.B.I. witnesses. It is interesting that Cutler did not mention the only item on which his fingerprint was actually found. Cutler's statement is obviously mistaken, whether deliberately or not, and, even if true, would not contradict any of the evidence offered at the trial. Again, although it might implicate Cutler, it does not exonerate Lawrenson.

As the Fourth Circuit has recently pointed out, in order for newly discovered evidence to require a new trial, " ' * * * There must ordinarily be present and concur five verities, to wit: (a) The evidence must be in fact, newly discovered, i. e. discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal. * * * ' ". Mills v. United States, 281 F.2d 736, 738. See also Jones v. United States, 279 F.2d 433; Holmes v. United States, 284 F.2d 716.

(a) Much of the evidence is obviously not newly discovered, but might have been given by Lawrenson to his counsel at the time of the trial if he and M's Merrick had wished to do so.

(b) Defendant was not diligent since no effort was made to obtain this information from or through the government.

(c) At most, Cutler's affidavit impeaches Couch on one relatively unimportant point.

(d) None of the evidence is material to the issue involved, namely, the participation of Lawrenson in the robbery.

(e) In view of the strong evidence corroborating Couch in every important particular, and constituting in itself, apart from the testimony of Couch, sufficient evidence to show conclusively Lawrenson's implication in the crime, I am satisfied that the so-called newly discov-

ered evidence would have no substantial effect on a retrial and would not result in an acquittal.

### Order

The motion for new trial is hereby overruled.