**Maliki Shakur LATINE, a/k/a Gregory Latine, Petitioner,**

v.

**Louis F. MANN, Superintendent, Shawangunk Correctional Facility, Respondent.**

No. 91 Civ. 4548 (LMM).

United States District Court, S.D. New York.

Aug. 30, 1993.

Ira Mickenberg, Office of the Appellate Defender, New York City, for petitioner, Maliki Shakur Latine.

Robert M. Morgenthau, Dist. Atty., New York City (David Joseph Mudd and Elizabeth R. Nochlin, of counsel), for respondent Louis F. Mann.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

### I.

Petitioner, convicted, following a trial by jury, in the Supreme Court of the State of New York, New York County, in October 1981, of attempted murder in the first degree, assault in the first degree, and criminal possession of stolen property in the third degree, and sentenced, as a predicate felony offender, to twenty-five years to life and concurrent lesser terms, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]

In a decision dated April 16, 1981, Justice Burton B. Roberts denied petitioner's pretrial motion for a severance based upon statements inculpating petitioner made by his codefendant Jose Saldana ("Saldana") to a third party witness. The trial court concluded that "the various statements made both by Saldana and this defendant ... are so consistent and intertwined as to fit easily into the exception to *Bruton* [*v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)] articulated in *People v. Berzups* [49 N.Y.2d 417, 426 N.Y.S.2d 253, 402 N.E.2d 1155 (1980)]." *People v. Latine*, slip op. at 3 (N.Y.Sup.Ct. Apr. 16, 1981).

At the joint trial of petitioner and Saldana (who did not testify), the latter's statement inculpating petitioner was admitted. On January 29, 1987, the Appellate Division agreed with petitioner's assigned counsel "that there were no nonfrivolous points which could be raised" on appeal. *People v. Latine*, 126 A.D.2d 496, 510 N.Y.S.2d 996, 996 (1st Dep't 1987). On February 8, 1988, the Court of Appeals granted petitioner's newly appointed counsel's application for leave to appeal. *People v. Latine*, 70 N.Y.2d 1007, 526 N.Y.S.2d 942, 942, 521 N.E.2d 1085, 1085 (1988). On June 2, 1988, the Court of Appeals reversed the order of the Appellate Division which had affirmed petitioner's conviction, and remanded the case to the Appellate Division "for a de novo consideration of the defendant's appeal. That court erred in

---

1. "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1988).

holding that there were no nonfrivolous points which could be raised on the appeal." *People v. Latine*, 72 N.Y.2d 823, 530 N.Y.S.2d 547, 547, 526 N.E.2d 38, 38 (1988).

On June 13, 1989, the Appellate Division affirmed petitioner's conviction, holding that, although "the admission, at a joint trial, of a nontestifying co-defendant's confession implicating the defendant is a violation of the defendant's constitutional right to confront the witnesses against him irrespective of whether the confessions are interlocking or not," *People v. Latine*, 151 A.D.2d 279, 542 N.Y.S.2d 554, 555 (1st Dep't 1989) (citing *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987)), nevertheless, under a harmless error analysis, petitioner's conviction should be affirmed because there was overwhelming evidence of his guilt independent of his co-defendant's inculpatory statements. *Latine*, 542 N.Y.S.2d at 557. Leave to appeal was denied by the Court of Appeals on August 14, 1989. *People v. Latine*, 74 N.Y.2d 812, 546 N.Y.S.2d 570, 570, 545 N.E.2d 884, 884 (1989). Petitioner filed the instant petition on July 2, 1991. In the petition, petitioner argues again that his constitutional rights pursuant to the Confrontation Clause of the Sixth Amendment to the Constitution were violated by the admission at trial of statements made by his non-testifying codefendant which directly incriminated him. For the reasons that appear below, the writ is granted.

## II.

Petitioner's conviction arises from a series of alleged incidents which led to the shooting of Police Sergeant Patrick Pellicano. In the early morning of July 3, 1979, a gypsy taxicab was allegedly struck from the rear by a stolen blue Chevrolet Malibu (the "Malibu") while crossing the 181st Street Bridge into the Bronx. (Trial Tr. at 741–42.) The Malibu was allegedly occupied by four men. (*Id.* at 605.) The driver of the taxicab, Locksley Green ("Green"), radioed his dispatcher for

assistance. (*Id.* at 742.) Shortly thereafter, another gypsy taxicab driven by Horace Neufville ("Neufville"), the manager of the car service which employed Green, arrived at the scene of the collision. (*Id.* at 782.) Green asked the driver of the Malibu for his license and registration. (*Id.* at 745.) The driver responded that he had none. As a result, Neufville said to Green "why don't you radio in and have them send the police over." (*Id.* at 783.)

The driver of the Malibu returned to the car and drove away. "When I started to approach my car, you know, he got in his car and he started driving off." (*Id.* at 784.) The two taxicabs pursued the fleeing Malibu. (*Id.*) "They continued down and then when they got about to 170th Street, they make a left there, someone, you know, jumped out the car." (*Id.*) "As soon as I got up to in front of the building, I heard a shot, I ducked, I heard another shot, I kept going." (*Id.* at 749.)

Police Officers Joseph Monteleone ("Officer Monteleone") and Patrick Pellicano ("Officer Pellicano") received a radio alarm describing the collision and subsequent shooting; the transmission contained the Malibu's license number. (*Id.* at 566.) [2] Between 4:30 and 4:45 A.M., the police officers, driving in a marked police car, observed the Malibu. (*Id.* at 1895.) They "immediately called for a back up unit on the radio and we followed this particular car that was previously wanted on this alarm" (*id.* at 1888) until it stopped on 148th Street between Seventh and Eighth Avenues in Manhattan. As they approached the stopped Malibu, an individual allegedly "spr[a]ng up in the car and at that point there was a blast in the car, a blast and at the same time the glass from one of the right-hand windows exploded out and in the same instant Sergeant Pellicano's face exploded. He was bleeding immediately, there was a splattering." (*Id.* at 577.) Both officers returned fire. Jamal Thomas ("Thom-

---

2. Operator—Police Operator 519, where's the emergency?
Caller—OK listen, this is OJ Car Service in the Bronx, right—we just had a hit and run and the guy was shooting at my driver—he's driving a blue chevrolet Malibu—license # —

Operator—Not so far, now—blue chevy
Caller—Malibu, lic. plate # is 242zHA, ZEBRA Harry, Anthony.
(*Id.* at 871.)

as"), identified as the driver of the Malibu by Officer Monteleone (*id.* at 691), got out of the Malibu and ran, empty-handed, east on 148th Street. (*Id.* at 577.) As a result of the shooting, Officer Pellicano lost his right eye, and his vision in his left eye was permanently impaired. (*Id.* 1907–09.)

Later that day, police investigators recovered a considerable amount of physical evidence, including, *inter alia,* guns, ballistics evidence, clothing, and fingerprints, from the crime scene. (*Id.* at 887–89, 891 & 1116–17.) Shortly after the shooting, on July 7, 1979, police officers located and arrested Arkil Shakur ("Shakur"), who was allegedly wounded during the shooting, by following a trail of blood. "At 21 Macombs Place, someone spotted a figure down, secreted below the basement, at which time two emergency servicemen, myself and two detectives, went down and apprehended Arkil Shakur." (*Id.* at 1327.)

Petitioner was arrested on August 7, 1979. Saldana was arrested in February 1980. On May 16, 1980, petitioner and Saldana were indicted. Petitioner and Saldana proceeded to trial on June 26, 1981. After a four week trial, the jury convicted both petitioner and Saldana as charged.

At trial, testimony was presented that petitioner's fingerprints were found on the exterior of the Malibu, that petitioner had told several individuals that he had shot Officer Pellicano, and that Saldana had told a witness that he had forced petitioner to shoot Officer Pellicano.

### III.

█ A prerequisite to federal habeas corpus review of a state court conviction is that a petitioner exhaust all available state remedies with respect to each claim he or she presents in his or her petition. *Rose v. Lundy,* 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982); 28 U.S.C. § 2254(b), (c) (1988). Respondent does not dispute that petitioner has exhausted his state court remedies.

At issue, then, is petitioner's contention that the admission of Saldana's statement inculpating him violated his Sixth Amend-

ment rights. In opposition, respondent argues that "the admission in evidence of Saldana's statement comported with the requirements of the Confrontation Clause. Thus, no error of federal constitutional dimension occurred regarding the statement's admission. In any event, the admission of the statement was harmless." (Resp't Mem. at 30.)

### IV.

The Sixth Amendment to the Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall the enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]he right of cross-examination is included in the right of an accused in a criminal case to confront witnesses against him." *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). That right of an accused to cross-examine witnesses against him or her is a major reason underlying the Confrontation Clause. *Id.* at 406–07, 85 S.Ct. at 1069.

In *Bruton v. United States,* the Supreme Court addressed the issue of the admission, at a joint trial, of a confession by one defendant inculpating the other.

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.... Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It

was against such threats to a fair trial that the Confrontation Clause was directed.

391 U.S. at 135–36, 88 S.Ct. at 1627–28 (citations and footnotes omitted). The *Bruton* Court did not squarely address the Confrontation Clause's interaction with hearsay rules, although it did briefly discuss hearsay in its decision.[3] In *United States ex rel. Catanzaro v. Mancusi,* 404 F.2d 296, 300 (2d Cir.1968), *cert. denied,* 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970), the Second Circuit distinguished between a *Bruton* situation in which a defendant who did not confess was tried jointly with a codefendant who did confess and a situation in which both defendants confessed and the confessions interlocked. The Second Circuit found no Confrontation Clause problem in the latter situation. "In our case Catanzaro himself confessed and his confession interlocks with and supports the confession of McChesney." *Id.; see also People v. Berzups,* 49 N.Y.2d 417, 426 N.Y.S.2d 253, 256–57, 402 N.E.2d 1155, 1158–59 (1980) ("a codefendant's confession need not violate the spirit of the *Bruton* rule when the implicated defendant himself has made a confession close enough to the one offered against him to make the probability of prejudice so 'negligible' that in the end 'the result would need to be the same'.... The justification for this exception is that separate confessions, without being mirror images of one another may yet be so duplicative in their description of the crucial facts that the one of the nontestifying codefendant may be of no measurable consequence in the face of the overwhelming and largely uncontroverted evidence contained in the interlocking confession of the defendant himself") (citations omitted). The plurality of four Justices in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), found no Confrontation Clause violation when the defendant had confessed because the defendant's "case has already been devastated by his own extrajudicial confession of guilt." *Id.* at 75 n. 7, 99 S.Ct. at 2140 n. 7. As discussed earlier,

petitioner's motion for severance was denied based on this interlocking confession exception to *Bruton.*

In *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), the Supreme Court examined this interlocking confession exception to *Bruton.*

> [I]t seems to us that "interlocking" bears a positively inverse relationship to devastation. A codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, but enormously damaging if it confirms, in all essential respects, the defendant's alleged confession.

*Id.* 481 U.S. at 192, 107 S.Ct. at 1718. "We hold that, where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant ..., the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant." *Id.* at 193, 107 S.Ct. at 1719 (citation omitted). In *Cruz,* the Supreme Court did not specifically address the use of hearsay rules as a procedure for admitting such confessions.[4]

The Second Circuit has determined that *Cruz* must be applied retroactively because "it altered our understanding of a 'bedrock procedural element.'" *Graham v. Hoke,* 946 F.2d 982, 994 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 890, 116 L.Ed.2d 793 (1992). Although the impact of retroactivity may be significant, "'the constitutional error presents a serious risk that the issue of guilt or innocence may not have been reliably determined.'" *Id.* (quoting *Roberts v. Russell,* 392 U.S. 293, 295, 88 S.Ct. 1921, 1922, 20 L.Ed.2d 1100 (1968)).

## V.

As already discussed, the New York State Court of Appeals remanded petitioner's case to the Appellate Division for a *de novo* re-

---

**3.** For example, the Supreme Court stated that "[w]e emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence." *Id.* 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3 (citations omitted).

**4.** The Court noted, however, that a confession's "reliability, however, may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be *admitted as evidence* against the defendant." *Id.* 481 U.S. at 192–93, 107 S.Ct. at 1719.

view of his appeal. *People v. Latine,* 72 N.Y.2d 823, 530 N.Y.S.2d 547, 547, 526 N.E.2d 38, 38 (1988). Recognizing that the procedure employed at petitioner's trial was erroneous and violated *Cruz,* the Appellate Division also determined that a harmless error analysis was applicable. "Under such an analysis, the conviction in this case should be affirmed because there was overwhelming evidence of defendant's guilt independent of Saldana's admission." *People v. Latine,* 151 A.D.2d 279, 542 N.Y.S.2d 554, 555 (1st Dep't 1989). This Court cannot agree. Before engaging in its own harmless error analysis, however, the Court first considers respondent's argument that petitioner's nontestifying codefendant's admission was admissible because in *Bruton* "the Supreme Court did not preclude the admission of a nontestifying codefendant's admission under a recognized hearsay exception." (Resp't Mem. at 18.) Petitioner rightly objects that respondent now raises, for the first time in this case's fourteen year history, a potential hearsay exception as a basis for sustaining the erroneous admission of petitioner's codefendant's statement inculpating petitioner. The Court also finds respondent's argument without merit. An examination of respondent's contentions in this regard will nevertheless, the Court believes, make the analysis of petitioner's constitutional claim clearer.

## VI.

■ Hearsay has been defined as " 'testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' " *Lee v. Illinois,* 476 U.S. 530, 543 n. 4, 106 S.Ct. 2056, 2063 n. 4, 90 L.Ed.2d 514 (1986) (citation omitted).

The statement at issue was allegedly made during a conversation between Saldana and Donell Brown ("Brown"). Brown testified as follows:

Q. Did he say anything about what happened during the shooting?

A. Well, that Malie [petitioner] wouldn't shoot and he had to make Malik [petitioner] shoot. He had to pull his pistol—put his pistol to Malike [petitioner] and make him open up, open fire on the police.

Q. Did he say what happened?

A. He say Malik [petitioner] shot, he shot through a window, through the car window.

Q. Did Jose [Saldana] say anything about after that? ...

A. I asked if he had shot him and he told me, yeah, he repeated it like it just had happened and he said that the cops started shooting [shouting ?], I'm hit, I'm hit and the other one was hollering, sarge, are you hurt, sarge, are you hurt.

The Court: Who told you this?

The Witness: Jose told me this.

The Court: By Jose you mean Jose Saldana?

The Witness: Yes.

(Trial Tr. at 1604–05.) Saldana's alleged statement can be construed as an admission [5] and therefore not hearsay as applied to Saldana, but as hearsay as applied to petitioner, and therefore, not admissible against petitioner. It may also be construed as a statement against Saldana's penal interest,[6] thus falling within an exception to the hearsay rule, and so admissible against petitioner, but that characterization is questionable in the present case, and also presents a Confrontation Clause—not merely an evidence—problem.

---

**5.** Rule 801 of the Federal Rules of Evidence (not applicable at the state court trial, of course, but useful, as are other parts of those rules, for definitional purposes) states, in pertinent part, that an admission by a party-opponent is a statement "offered against a party and is (A) the party's own statement in either an individual or a representative capacity." Fed.R.Evid. 801(d)(2).

**6.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to

subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3).

A statement of a hearsay declarant is admissible under the Confrontation Clause only when it bears "adequate 'indicia of reliability.'" *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). That "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.* Hearsay evidence which does not fall within a "firmly rooted hearsay exception,"[7] however, is inadmissible under the Confrontation Clause, "at least absent a showing of particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539 (footnote omitted).

> Reflecting its underlying purposes to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule."

*Id.* at 65, 100 S.Ct. at 2539 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)). In *Lee,* the Supreme Court rejected the state's bases for finding that a defendant's accomplice's confession was reliable. *Lee,* 476 U.S. at 544–45, 106 S.Ct. at 2064. In fact, the Supreme Court "reject[ed] respondent's categorization of the hearsay involved in this case as a simple 'declaration against penal interest.' That concept defines too large a class for meaningful Confrontation Clause analysis. We decide this case as involving a confession by an accomplice which incriminates a criminal defendant." *Id.* at 544 n. 5, 106 S.Ct. at 2064 n. 5.

Respondent contends that Saldana's statements against penal interest are within a firmly rooted hearsay exception. Based on the Court's own research, the Court does not agree.

While it is undisputed that the Second Circuit, in *United States v. Katsougrakis*, 715 F.2d 769, 776 (2d Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), stated that a hearsay statement that satisfies the penal interest exception falls within a firmly rooted hearsay exception, *Katsougrakis* was decided prior to *Lee.* As noted above, the Supreme Court in *Lee* refused to categorize the statement at issue in that case as "a simple 'declaration against penal interest.'" *Lee,* 476 U.S. at 544 n. 5, 106 S.Ct. at 2064 n. 5. More recently, this Circuit has revisited its prior conclusion that a statement against penal interest is a firmly rooted hearsay exception. Earlier this year the Court of Appeals stated that "[s]ome recent cases cast some doubt on this conclusion, however, and the Supreme Court has not addressed the question." *Bakhtiar,* 994 F.2d at 977. The basis for that doubt apparently is the belief that "the exception for declarations against penal interest is not firmly rooted because it historically has been quite controversial, because it has only recently been added to the Federal Rules of Evidence, and because the Supreme Court has indicated that statements against penal interest which also inculpate a third party are often suspect." *Id.* at 978 (citing *United States v. Flores,* 985 F.2d 770, 777–80 (5th Cir.1993)).

Support for the conclusion that the penal interest exception is not firmly rooted can be found in 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1476 (revised by James H. Chadbourne, 1974) [hereinafter *"Wigmore on Evidence"*]. In its discussion of the history of the exclusion from admission at trial of statements against penal interest, *Wigmore on Evidence* states that "[i]t is today commonly said, and has been expressly laid down by many judges, that the interest prejudiced by the facts stated must be *either a pecuniary or a proprietary interest,* and not a *penal interest."* *Id.* § 1476, at 349. From approximately 1800 to 1830, all declarations made by a deceased person against his or her interest, whether pecuniary, proprietary, or penal, were received into evidence. *Id.* § 1476, at 350. "This unity lay in the circumstance that all such statements, in that they concerned matters prejudicial to

---

**7.** "The Supreme Court uses the term 'firmly rooted' to describe those hearsay exceptions which 'rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of constitutional protection."'" *United States v. Bakhtiar,* 994 F.2d 970, 977 n. 5 (2d Cir.1993) (quoting *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539).

the declarant's self-interest, were fairly trustworthy and might therefore (if he were deceased) be treated as forming an exception to the hearsay rule." *Id.* "But in 1844, in a case in the House of Lords ... [i]t was held to exclude the statement of a fact subjecting the declarant to a *criminal liability,* and to be confined to statements of *facts against either pecuniary or proprietary interest.*" *Id.* § 1476, at 351 (footnote omitted). "The same attitude has been taken by most American courts, excluding confessions of a crime or other statements of facts against penal interest, made by third persons." *Id.* § 1476, at 352–58 (footnote omitted). Justice Holmes' dissent in *Donnelly v. United States,* 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913),[8] underscores the lack of uniform opinion pertaining to the admissibility of statements against penal interest in the early part of this century.

■ In addition, the Advisory Committee Notes to the proposed 1972 Federal Rules of Evidence indicate that the common law refused "to concede the adequacy of a penal interest." Fed.R.Evid. 804(b)(3) advisory committee's note. The Committee on the Judiciary noted that the proposed rule, later enacted, would "expand the hearsay limitation from its present federal limitation to include statements subjecting the declarant to criminal liability." H.R.Rep. No. 650, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 7075, 7087. Accordingly, this Court concludes that, based on the relatively short period of acceptance of the exception and the continuing debate and controversy surrounding such a statement's reliability, a statement against penal interest is not "firmly rooted" within the meaning ascribed to that phrase.

Where a statement is not within a firmly rooted hearsay exception, it is presumed to be unreliable, and can only be admitted upon a " 'showing of particularized guarantees of

trustworthiness.' " *Lee,* 476 U.S. at 543, 106 S.Ct. at 2063 (quoting *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539). As discussed below in greater detail, Saldana's statement was not accompanied with a showing of particularized guarantees of trustworthiness to warrant its admission into evidence.

## VII.

■ "We think the 'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must likewise be drawn from the totality of circumstances that surround the making of the statement and that render the declarant *particularly* worthy of belief." *Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 (1990) (emphasis added). The Supreme Court in *Wright* rejected the "State's contention that evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears 'particularized guarantees of trustworthiness.' " *Id.* at 822, 110 S.Ct. at 3150. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its *inherent* trustworthiness, not by reference to other evidence at trial." *Id.* (emphasis added).

The circumstances surrounding the making of Saldana's statement do not at all render that particular declaration "particularly worthy of belief," *id.* at 820, 110 S.Ct. at 3148, or show "inherent trustworthiness." *Id.* at 822, 110 S.Ct. at 3150. Quite the contrary. Assuming for the moment that Saldana made the declaration as recounted by Brown—a challengeable proposition itself—the statement is part inculpatory and part exculpatory. While taking blame for involvement in the shooting, Saldana shifts responsibility for the seemingly more serious aspect of the crime—the actual shooting of Officer Pellicano—to petitioner.[9] Saldana

---

**8.** In *Donnelly,* Justice Holmes argued for the admissibility into evidence of the confession of a deceased person "coupled with circumstances pointing to its truth." *Id.* at 277, 33 S.Ct. at 461 (Holmes, J., dissenting).

**9.** Saldana's attempt to assign guilt to petitioner was unsuccessful. As discussed earlier, he was

convicted of attempted murder in the first degree and other offenses. "Testimony at trial indicated that [Saldana] pointed a gun at Latine and 'ordered' him to shoot." *People v. Saldana,* 161 A.D.2d 441, 556 N.Y.S.2d 534, 535 (1st Dep't), *appeal denied,* 76 N.Y.2d 944, 563 N.Y.S.2d 73, 564 N.E.2d 683 (1990).

had every reason to lie and to shift responsibility away from himself.[10] In communicating the alleged details to Brown, Saldana was not subject to perjury charges or cross-examination. Further, the statement was made while Saldana was in hiding and attempting to avoid arrest.

Saldana and Brown allegedly encountered each other at Delores Dubois' ("Dubois") apartment, where Brown was living, in the early morning of July 3, 1979 when Shakur, Saldana, Thomas, and petitioner arrived there after they "had bumped into a taxi and the cab driver wanted some identification." (Trial Tr. at 1589.) That afternoon, after Saldana returned to Dubois' apartment, he and Brown allegedly left the apartment and went to Edgecomb Park. (*Id.* at 1602.) It was in this park that Saldana allegedly recounted the events of that morning to Brown after first being informed by Brown that he "had seen on the news where police had got shot, and where they had someone in custody, they had Arkil in custody. And I asked him what had happened." (*Id.*) Brown's testimony recounting his encounter with Saldana is reasonably susceptible to the inference that Saldana attempted to downplay his role in the shooting incident. Once confronted with the news of the arrest of one of his confederates, Saldana could well have tried to diminish his involvement in Officer Pellicano's injuries by blaming petitioner for the actual shooting.

In addition to the above circumstances surrounding Saldana's declaration, Brown's own credibility is also subject to challenge. Brown testified at petitioner's trial pursuant to a cooperation agreement. That agreement provided, *inter alia*, that Brown would

be "paroled to a witness protection program" (*id.* at 1582), that he "would be offered a plea of an E felony in place of a D felony" (*id.*), that he would be sentenced to "[o]ne and a half to three years ... [t]o run consecutive" (*id.*) in a pending case, that the District Attorney "wouldn't run a lineup on a case that I had been a suspect in" (*id.* at 1583), and that if he "decided to go to trial and testify in my own behalf, that you wouldn't bring up my prior criminal record." (*Id.* at 1584.) The existence of this cooperation agreement places Brown's motivation for testifying and much of his testimony in question. For example, Brown may have believed that in order for the terms of the cooperation agreement to be fulfilled, his testimony had to please the district attorney. Brown's reliability is also challengeable due to his extensive use of alias.[11] Further raising questions concerning Brown's truthfulness is his criminal record. For instance, Brown was convicted of criminal trespass in 1972 and 1977 (*id.* at 1715, 1718), robbery (*id.* at 1716), disorderly conduct in 1977 and 1978 (*id.* at 1718–19), and loitering in 1978. (*Id.* at 1720.)[12]

Based on the totality of circumstances surrounding Saldana's statement inculpating petitioner, the Court cannot conclude that particularized guarantees of trustworthiness were present. Accordingly, the erroneous admission into evidence of Brown's testimony at petitioner's joint trial violated petitioner's rights under the Confrontation Clause.

## VIII.

■ Respondent argues that "[i]n any case, petitioner could not have been harmed

---

10. "As we have consistently recognized, a codefendant's confession is presumptively unreliable *as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.*" *Lee,* 476 U.S. at 545, 106 S.Ct. at 2064.

11. Q. Have you ever been known by any other names?
A. Yes.
Q. Could you tell us the names?
A. Leroy Allen.
Q. Yes?

A. And Laverne Ballantine.
Q. Anything else?
A. A nickname, Sincere. ...
Q. Were you ever known as Ronald Dillworth?
A. Yes.
Q. Were you ever known as Raheen Ara Malik; were you ever known by that name?
A. Yes. ...
Q. Were you ever known as Darnell Albrown?
A. Yes.
(*Id.* at 1649–51.)

12. Brown was incarcerated from October 1973 to July 1977. (*Id.* at 1716.)

by the admission in evidence of Saldana's statement." (Resp't Mem. at 28.) The Court disagrees.

Prior to the Supreme Court's recent decision in *Brecht v. Abrahamson*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the standard for determining whether a conviction must be set aside because of federal constitutional error was whether the error "was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The error now must have " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht*, —— U.S. at ——, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Brecht*, —— U.S. at ——, 113 S.Ct. at 1722.[13] "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, —— U.S. ——, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). The Supreme Court has acknowledged "the impossibility of determining whether in fact the jury did or did not ignore [the] statement inculpating petitioner in determining petitioner's guilt," *Bruton*, 391 U.S. at 136, 88 S.Ct. at 1628, but has also suggested that whether "error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony ... and, of course, the overall strength of the prosecution's case." *Delaware v. Van Ars-*

*dall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). "The strength of the prosecution's case is probably the single most critical factor in determining whether error was harmless." *United States v. Castano*, 999 F.2d 615, 618 (2d Cir.1993).

Application of the *Brecht–Sullivan* standard commands the conclusion that the error in admitting Brown's testimony as to Saldana's statement was not harmless.

At trial, the prosecution in petitioner's case relied on the testimony of certain key witnesses—Loretta Martin, Patricia Martin, and Brown—as well as expert testimony regarding fingerprint identification. Neither Officer Monteleone nor Officer Pellicano identified petitioner. Neither Green nor Neufville identified petitioner as one of the passengers of the Malibu.

Based on the particular circumstances of petitioner's case, the Court concludes that the admission of Saldana's inculpatory statement had a substantial and injurious effect or influence in determining the jury's verdict; the Court cannot say that the guilty verdict was surely unattributable to the error. Without Saldana's declaration the often contradictory testimony of Loretta Martin ("L. Martin"), Patricia Martin ("P. Martin"), and Brown would not have been corroborated. There also would have been no admissible evidence placing petitioner inside the Malibu at the time of the alleged incident.

L. Martin testified that she and Shakur[14] lived together as man and wife, but were unmarried. (Trial Tr. at 1157.) L. Martin testified that between April or May 1979 to July 3, 1979 some of Shakur's friends—Saldana, petitioner, and Thomas—came over to her and Shakur's apartment two or three times. (*Id.* at 1159.) Sometime after 5:00 A.M. on July 3, 1979, petitioner allegedly told L. Martin "to get some pants and take it to Arkil because he was hurt, he was in an abandoned building, so I got it." (*Id.* at 1169.) Later that morning after L. Martin,

---

13. The erroneous admission of Saldana's statement inculpating petitioner is a trial—as opposed to a structural—error, and thus subject to harmless error analysis under *Arizona v. Fulminante*, 499 U.S. 279, —— – ——, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991).

14. *I.e.*, Arkil Shakur, not petitioner Maliki Shakur Latine.

petitioner, and Shakur's mother allegedly attempted to locate Shakur, L. Martin and petitioner went to Mary Hall's apartment which was located in the same building as L. Martin's apartment. (*Id.* at 1173.) According to L. Martin, petitioner "was just telling us what had happened, the whole night." (*Id.* at 1174.) Petitioner allegedly recounted these events to Mary Hall, Jackie Lewis, Gail Hall, and P. Martin, L. Martin's sister. (*Id.* at 1174.)

> He said that they was riding in a car in the Bronx. They was riding and they accidentally bumped into this cabdriver. And the cabdriver asked them for their license. And then Jamal shot at the cabdriver. The police picked up a trail about three blocks later and chased them down to 148 Street. Then the police walked over to the car and put the gun to Arkil head. And he [*i.e.*, petitioner] had jumped about the back seat and shot the cop because the cop was going to kill Arkil. He had to do it in order to save Arkil.

(*Id.* at 1176.) Shortly thereafter, "[e]verybody that was in Mary apartment went over to my apartment." (*Id.* at 1179.) In L. Martin's apartment, petitioner "didn't mention it too much up there, but he told what had happened as far as the cops shooting and Arkil had got shot, but he didn't mention, you know, anything else." (*Id.* at 1180.)

After Shakur was arrested, L. Martin visited him in the hospital and in jail. (*Id.* at 1204, 1208.) L. Martin also "spoke to his lawyer, if that's the name." (*Id.* at 1205.) In addition to speaking to Shakur's lawyer about Shakur's case during these meetings, L. Martin allegedly discussed police threats to her family. "The police actually came to my house and have hit may family." (*Id.* at 1207.) [15]

Shakur was also visited by P. Martin and Jackie Lewis. (*Id.* at 1210.) P. Martin and Ms. Lewis accompanied L. Martin to visit Shakur and also visited Thomas. (*Id.*) "[M]e and Arkil sat together. Patricia and Jackie and Jamal and then me and Patricia and Arkil, but they didn't let both inmates get together." (*Id.* at 1211.) During one visit to Shakur, L. Martin signed a document. "That was the first paper that I signed. It was a whole lot of things that he was, you know, he would get me, give it to his lawyer, but I never did. He would take it to him himself. But he had to have my signature. So I just signed it for him. Anything that could help him." (*Id.* at 1251.) [16]

When the police began investigating Officer Pellicano's shooting, L. Martin lied to the police regarding her identity. "They asked me did I know Loretta Martin, and then I said no. Then I said, yeah, I know her. That's my cousin. They said who was I—I said, Lorraine Harris." (*Id.* at 1214.) "At that time I was scared because the shooting had just occurred, and I thought they were coming to get me." (*Id.*) L. Martin allegedly feared being implicated because Shakur was involved. L. Martin was only interested in protecting herself. (*Id.* at 1215.) [17] A

---

15. "[The police] came in in a bench [sic] and start hitting my nephew on the head and knocked down my pregnant sister-in-law. They told my mother if they don't find me they were going to kill." (*Id.* at 1260.)

16. Q. And you'd say anything today to help him, correct?
A. No. I don't feel the way I used to feel about him.
Q. So now you don't care to help him; is that correct?
A. I didn't say that—
Q. Well—
A. I just don't feel, I don't know.
Q. You have mixed feelings about it?
A. I don't feel the way I used to feel about him.
Q. You have mixed feelings about it, right?
The Court: Sustained.

Q. Did you just say that you signed other papers?
A. Yes.
Q. Do you know what was in those papers?
A. He had just asked me, you know, had the police still picked you up, whatever. I tell him yeah. So he'd write something down to his lawyer to get the police stop harassing me. And I signed my name.
(*Id.* at 1251–52.)

17. Q. You were not interested in a wounded police officer, were you?
A. I wasn't, I ain't going to say, no, I wasn't.
Q. You weren't interested in your friend, Arkil, were you?
A. No, because he was already in it.
Q. You figured he's goine [sic] anyway, right?
A. Right.
(*Id.*)

police officer questioning L. Martin allegedly "told [her] if [she] didn't tell him who the other three suspects were, what's their name, that [she] could go to jail for perjury or something because he know that [she] know, or something like that." (*Id.* at 1241.)

L. Martin's prior relationship with Shakur and her numerous visits to Shakur and to Thomas make her uncorroborated testimony far from compelling. Her acknowledged lies to the police raise serious questions regarding the truthfulness of her in court testimony.

P. Martin testified at trial that petitioner said "[t]hat Arkil got shot and he left him in an abandoned building and he came back to get Loretta but they couldn't find where he was at." (*Id.* at 1533.) "He said the cop was going to shoot Arkil in the head, his friend, so he shot him." (*Id.* at 1533–34.) P. Martin's prior grand jury testimony contradicts her trial testimony. For example, P. Martin testified before a grand jury that petitioner did not explain what happened. (*Id.* at 1540.) In addition, P. Martin stated during her grand jury testimony that she and petitioner had never had a conversation regarding the shooting. (*Id.* at 1544.) According to P. Martin, petitioner never told her why he allegedly fired. (*Id.* at 1546.) Later in her grand jury testimony, P. Martin stated that petitioner fired "because the sergeant was going to shoot Arkil in the head." (*Id.* at 1552.)

Like her sister's testimony, P. Martin's testimony can be viewed with considerable skepticism. P. Martin's credibility was severely damaged by her prior inconsistent grand jury testimony. In addition, P. Martin also visited Shakur in prison along with L. Martin. While no evidence was introduced at petitioner's trial of their complicity, an inference is possible that P. Martin and L. Martin agreed to shift fault to petitioner in an attempt to absolve Shakur.

In addition to the testimony of L. Martin and P. Martin, Brown testified at trial that he asked petitioner if "he had shot the police, he said, yeah, he had shot the police in the face and he told me he didn't have no place to go." (*Id.* at 1609.) As discussed above,

Brown's testimony does not exhibit trustworthiness and reliability.

The only physical evidence presented at trial of petitioner's connection with the Malibu is a positive identification of petitioner's fingerprint on the exterior of the Malibu's roof over the left front door. (*See id.* at 1509–10.) This single print appears to be the only independent evidence linking petitioner to the shooting of Officer Pellicano. The fact, however, that petitioner had been in contact with the Malibu—even the fact of presence at the time of the shooting—does not lead to the conclusion that he was the person who shot Officer Pellicano.

The admission of Saldana's statement inculpating petitioner corroborated otherwise questionable testimony, giving it credibility it otherwise lacked. The testimony of L. Martin and P. Martin is highly suspect because of their obvious motivation to implicate someone other than Shakur. Without the corroboration offered by Saldana's statement as conveyed by Brown, the jury would have had to rely on the testimony of a multiple felon, the testimony of an alleged accomplice's girlfriend, and the testimony of that girlfriend's sister, in order to convict petitioner. The guilty verdict rendered against petitioner at the conclusion of his joint trial was surely attributable to the erroneous admission of the inculpatory statement by his codefendant. Apart from Saldana's statement, the prosecution had a weak case. Taking the record of the instant case as a whole, this Court concludes that the constitutional error suffered by petitioner was not harmless.

CONCLUSION

For the foregoing reasons, petitioner's petition for a writ of habeas corpus is granted, unless the state provides petitioner a new trial within 120 days of the date of this Order.

SO ORDERED.